# EXHIBIT 67

# In The Matter Of:

*Circuit City Stores, Inc., et al v.*
*Sony Electronics, Inc.*

---

*Brandi Fose*
*June 25, 2014*

---

*Halasz Reporting*

Original File fose.txt
Min-U-Script®

1

```
 1              UNITED STATES BANKRUPTCY COURT
                 EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3  ------------------------------------
                                        :
 4  CIRCUIT CITY STORES, INC., et al,   :
                                        :
 5              Debtors,                :
    ------------------------------------
 6  Alfred H. Siegel, as Trustee of the :
    Circuit City Stores, Inc.           :
 7  Liquidating Trust,                  :
                                        :
 8                   Plaintiff,         :
                                        :
 9  v.                                  :      Case No.
                                        : 08-35653 (KRH)
10  SONY ELECTRONICS, INC.,             :
                                        :
11              Defendants.             :
                                        :
12  ------------------------------------

13

14
                   DEPOSITION OF BRANDI FOSE
15                      June 25, 2014

16

17
                     Richmond, Virginia
18

19

20

21

22

23      HALASZ REPORTING & VIDEOCONFERENCE
                   P. O. Box 1644
24        Richmond, Virginia 23218-1644
                Phone (804) 708-0025
25        Reported by:  Lisa T. Lineberry
```

2

1   APPEARANCES:

2

        ON BEHALF OF THE PLAINTIFFS:
3

            Andrew Caine, Esq.
4           Robert Feinstein, Esq.
            PACHULSKI STANG ZIEHL & JONES, LLP
5           1011 Santa Monica Boulevard, 13th Floor
            Los Angeles, California 90067-4003
6

7       ON BEHALF OF THE DEFENDANTS:

8           Andrew W. Goldwater, Esq.
            FRIEDMAN KAPLAN SEILER & ADELMAN, LLP
9           7 Times Square
            New York, New York 10036-6516
10
            Peter J. Barrett, Esq.
11          KUTAK ROCK, LLP
            Bank of America Center
12          1111 East Main Street, Suite 800
            Richmond, Virginia 23219-3500
13
            Lloyd B. Sarakin, Esq.
14          HENDERSON CAVERLY PUM CHARNEY, LLP
            12750 High Bluff Drive, Suite 300
15          San Diego, CA 92130

16

17

18

19

20

21

22

23

24

25

3

1                              I N D E X

2       Fose                                          Page

3       Examination by Mr. Goldwater                  4-112

4

5

6

7                            E X H I B I T S

8       Fose Deposition
        Sony Exhibit No.                              Page
9

10      1   Notice of Deposition                      19

11      2   Exhibit B, Pages 1-76                      19

12      3   Sony AP Data CCLT01273 - CCLT02159         28

13      4   Plaintiff's Responses to Defendant's First
            Set of Interrogatories to Plaintiff       48
14
        5   Chargeback 97769, CCLT030119-030136        59
15
        6   Advertising Billing Memorandum, SEL00000006   97
16
        7   Chargeback documents 92982                 99
17
        8   Billback Dec $572,740, SEL00000851-852     108
18

19

20

21

22

23

24

25

4

1                          BRANDI FOSE

2                was sworn and deposed as follows:

3                          EXAMINATION

4     BY MR. GOLDWATER:

5          Q    Good morning, Ms. Fose.  I introduced myself

6     before, I'll do it again.  I'm Andrew Goldwater.  I'm a

7     lawyer for Sony Electronics.  Where do you work?

8          A    With the Circuit City Trust.

9          Q    And do you have a position or a title with

10    the Trust?

11         A    I do.  It's accounts receivables and IT

12    manager.

13         Q    What responsibilities do you have with

14    accounts receivables?

15         A    Basically, the collection of the receivables,

16    but obviously, that entails supporting any adversary

17    proceedings, working with the attorneys, any

18    reconciliation between Circuit City and the vendors.

19         Q    And what are your responsibilities in the IT

20    area?

21         A    Basically, I oversee all the systems we have

22    in place, including, you know, desktops, servers, that

23    kind of thing, just to make sure that all the

24    applications that we use continue to be up and running

25    and are maintained and working efficiently.

5

1        Q    Do you report to anyone?

2        A    Yes.  I report to Katie Bradshaw.  She's the

3   senior trust manager, and we all ultimately report to

4   Al Siegel, the trustee.

5        Q    Do you report to Ms. Bradshaw as both for

6   your accounts receivable responsibly and your IT

7   responsibilities?

8        A    Yes.  She -- everyone at the Trust reports to

9   her.

10        Q    And I take it this is a full time job you

11   have?

12        A    Yes.

13        Q    When did you start to work for the Trust?

14        A    As soon as Circuit City became a trust, so

15   November of 2010.

16        Q    And where did you work before you worked for

17   the Trust?

18        A    I worked of Circuit City.

19        Q    What position or title did you have at

20   Circuit City immediately before you started working for

21   the Trust?

22        A    That's a good question.  I'm not -- we

23   weren't really retitled at that point, because we kind

24   of were all shuffled into different roles, but prior to

25   that, I was the inventory accounting manager, and then

6

1    I took over the receivables responsibilities in January

2    of 2009.

3        Q    What was your responsibility in the inventory

4    accounting position?

5        A    I oversaw the accounting for all merchandise

6    inventory.  So basically, the appropriate accounting,

7    all the inventory transactions that happened throughout

8    the company, as well as physical inventory.

9        Q    What were the AR responsibilities that you

10   assumed in about January of 2009?

11       A    The AR responsibilities that I assumed

12   related to vendor funding.

13       Q    When you say vendor funding, can you tell me

14   more what you mean by that?

15       A    Sure.  A lot of our vendors, Sony for one,

16   obviously, offered certain programs to Circuit City

17   that we ultimately would charge the vendor back for,

18   whether it would be for advertising or sales-based

19   promotions, rebates, et cetera.  There were many

20   different types of programs, but basically, we call

21   that vendor funding.  Within Circuit City, there were a

22   lot of different acronyms and names that may have been

23   thrown around to describe that department, but

24   ultimately, that's what we were in charge of collecting

25   and accounting for.

7

1        Q     Were there other people in the vendor funding
2    position or that had the vendor funding
3    responsibilities at the same time you did?
4        A     That had the same responsibilities that I did
5    or that worked within that area?
6        Q     Good point.  Were there other people who
7    worked in the same area?
8        A     Yes.  There was an entire department of
9    people, but in January, right about the 16th, when we
10   announced liquidation, a lot of folks were let go.  So
11   I don't remember the exact numbers of who was there
12   before or after that, to be honest.  But yes, there
13   were several people that had that responsibility.
14       Q     Can you tell me, as best you can remember,
15   who those people were?
16       A     Every single person?
17       Q     How many people are we talking about?
18       A     Maybe 20.
19       Q     Was there a person in charge of the vendor
20   funding area?
21       A     Well, in January, I was.
22       Q     I'm sorry, immediately before you.
23       A     Carole Elliott.
24       Q     E-l-l-i-o-t?
25       A     T, two T's, and Carole was with an "E" on the

8

1    end.

2         Q     E-l-l-i-o-t-t-e?

3         A     No, Carole has an "E" on the end.

4         Q     Oh, I'm sorry, Carole.

5         A     That's okay.

6         Q     Do you know where Carole is these days?

7         A     Yes.

8         Q     Where is she?

9         A     She works for Owens and Minor.

10        Q     Do you know what city that's in?

11        A     Yes.  It's in Mechanicsville, right outside

12   of Richmond.

13        Q     And do you happen to know what Carole's title

14   was at that time?

15        A     She was a group manager over vendor funded

16   accounting and inventory accounting.  So in my

17   inventory accounting role, I reported to her.  She also

18   had merchandise payables responsibilities.

19        Q     And were there people who were Carole's

20   immediate direct reports in vendor funding?

21        A     Yes.

22        Q     Who were those people?

23        A     Trying to remember.  At what point in time,

24   because people shuffled around a lot of Circuit City?

25        Q     Sure.  In the last quarter of 2008.

9

1        A    I believe Kelly Silva was the vendor funded

2   accounting manager, and then there were a couple other

3   folks, Greg Lambert.  He was a supervisor, and Jason

4   Garrett, he was also a supervisor.

5        Q    And were there approximately 17 other people

6   who reported up through either Kelly, Greg or Jason?

7        A    Yes.  There was one other supervisor.  Her

8   name was Susan Wilburn.

9        Q    How do you spell Susan's last name?

10       A    W-i-l-b-u-r-n.

11       Q    Do you know where Susan is now?

12       A    I do not.

13       Q    Do you know where Jason is now?

14       A    I do not.

15       Q    Do you know where Greg Lambert is?

16       A    I don't, sorry.

17       Q    Do you know where Kelly Silva is?

18       A    I don't.  Heather may, but I don't.

19       Q    When you assumed responsibilities for vendor

20   funding in January of 2009, was there somebody that you

21   reported up to?

22       A    Yes, Michelle Mosier.

23       Q    Do you happen to know if Ms. Mosier had any

24   responsibility with respect to vendor funding before

25   January of 2009?

10

1      A    Yes.  Carole reported to Michelle for as long

2   as I can remember.

3      Q    What did you do when you assumed

4   responsibility for vendor funding in January of 2009?

5   What were you doing in that area?

6      A    Immediately, I was just tasked with insuring

7   that any open funding items were reconciled, supported

8   and ultimately billed out to the vendors.

9      Q    Okay.

10     A    And then from there, obviously, the

11  collection of the receivables and any reporting.

12     Q    And when you say reporting in this context,

13  what kind of reporting are you talking about?

14     A    Just providing senior management with

15  reporting on what receivables we had outstanding and

16  what vendors.

17     Q    All right.  You may have told me this before,

18  and if so, I apologize, but were you in the inventory

19  accounting area also before January of 2009?

20     A    Yes.

21     Q    And it was in January of 2009, the change

22  that happened was you picked up this other

23  responsibility for --

24     A    Yes, that's correct.

25     Q    -- vendor funding?

11

1          MR. CAINE:  Let him finish the question

2     before you answer.

3          THE WITNESS:  Sorry.

4          MR. CAINE:  Just in case he throws something

5     in at the end.

6          MR. GOLDWATER:  I'm very tricky.

7  BY MR. GOLDWATER:

8     Q    How long did you have the inventory

9  accounting responsibilities?

10    A    I believe I came over there in, let's see,

11 April of 2007-ish.

12    Q    And were you reporting -- who did you report

13 to when you first came over to Circuit City?

14    A    When I first came to Circuit City or

15 inventory?

16    Q    I'm sorry, to inventory.

17    A    Carole Elliott.

18    Q    So throughout the time you were at Circuit,

19 you were reporting to Carole on the inventory side?

20    A    On the inventory side, yes.

21    Q    Okay.  And before you were in the inventory

22 accounting area, did you have another job?

23    A    Yes.

24    Q    What was that?

25    A    Before that, I was the accounting liaison for

12

1    a project called MST, which was the merchandise

2    transformation.

3        Q    And was that a systems project?

4        A    Yes.

5        Q    What kind of system was that about?

6        A    It was basically to replace all of the

7    disjoined, disconnected merchandise systems that we had

8    in place.

9        Q    And who did you report to in that job?

10       A    Anne Fath, F-a-t-h, and Anne is with an "E"

11   on the end.

12       Q    Okay.  For what period of time were you the

13   accounting liaison for MST?

14       A    October, 2006, through when I went to

15   inventory.  It was about six months.

16       Q    Okay.  And before October '06, were you

17   working at Circuit City?

18       A    Yes.

19       Q    And what was your position or title?

20       A    I was the fixed assets and project accounting

21   manager.

22       Q    Project accounting?

23       A    Yes, sir.

24       Q    And what were your responsibilities in that

25   position?

13

1         A     I basically oversaw all the fixed assets of

2    the company, made all the capitalization determinations

3    for projects and capital expenditures, reported, you

4    know, project accounting budgets and forecasts to the

5    CFO.

6         Q     Who was the CFO at that time?

7         A     At which point in time?

8         Q     When you were reporting to the CFO.

9         A     I didn't report to the CFO.  I provided

10   reporting to the CFO.

11        Q     Oh, I see.  Who did you report to?

12        A     I reported to Jeff McDonald.

13        Q     All right.  And what period of time did you

14   have the fixed assets and project accounting

15   responsibility?

16        A     April, 2001 through October, 2006.

17        Q     Were you at Circuit City before April of

18   2001?

19        A     Yes.

20        Q     And what was your job?

21        A     Prior to the fixed assets and project

22   accounting, I was the expense payable supervisor.

23        Q     What were your responsibilities in the, as an

24   expense payables supervisor?

25        A     Oversaw the payment of non-merchandise

**14**

1    expenses, utilities, travel reimbursements, supplies.

2        Q    And over what period of time were you in that

3    function?

4        A    This is going to get a little sketchy.

5        Q    Just your best recollection is fine.

6        A    Okay.  I want to say I was in that department

7    about a year or so, just to back into it, maybe April

8    of 2005 through April of 2006-ish.

9        Q    And was it only from April, 2006 to October,

10   2006 that you were --

11       A    I'm sorry, 2001, so then it would have been

12   April, 2000, through April, 2001.

13       Q    Were you at Circuit City before you were in

14   the expense payable's supervisor position?

15       A    Yes.  I was the inventory accounting

16   supervisor.

17       Q    Over what period of time?

18       A    I was there for about a year and a half prior

19   to the expense payables role.

20       Q    Okay.  And were you at Circuit City before

21   you were in the inventory accounting supervisor

22   position?

23       A    Yes.

24       Q    What was your function?

25       A    I was the internal audit supervisor.

15

1      Q    Over what period of time?

2      A    I was in that department for about, let's

3  see, I started with Circuit City -- it might be easier

4  to start that way.  I'm sure I'm going to screw these

5  dates up.  I started with Circuit City in December of

6  '97, and I believe, as an internal auditor, and I was

7  in that role until, I don't remember exactly, but it's

8  some time in '99, when I became the internal audit

9  supervisor.  And from there, I went to inventory

10  accounting.  I don't know that those dates mesh, but

11  it's close.

12     Q    What were your duties in the internal audit

13  function?

14     A    Well, we reported to the audit committee,

15  ultimately, and they kind of set what it was that they

16  wanted us to audit, and we went into different

17  departments throughout the company in accounting and

18  otherwise, and looked at their process and made

19  recommendations, determined risks, that type of thing.

20     Q    Okay.  What was the highest level of

21  education that you attained?

22     A    I have a bachelor's degree.

23     Q    And what year?

24     A    '95, I believe.

25     Q    Okay.  Were you working in between college

16

1    and the time you came to work for Circuit City?

2         A     Yes, I worked in public accounting.

3         Q     At a public accounting firm?

4         A     Yes.

5         Q     What was the name of the firm?

6         A     I worked for two firms.  One was Cherry,

7    Bekaert and Holland, and the other was Todd Rivenbard

8    and Puryear.

9         Q     Okay.  Now circle all the way back to while

10   you were working for Circuit City.  Let me ask you, up

11   through the point where you assumed the vendor funding

12   function in January of 2009, did you deal with Sony at

13   all?  Did you talk to people at Sony or correspond with

14   them?

15        A     I didn't necessarily talk to people at Sony,

16   but through the inventory function, itself, you know,

17   we had transactions, obviously, that related to Sony.

18        Q     Okay.  And I take it none of that involved

19   chargebacks or vendor funding?

20        A     No.  Only to the extent that, obviously,

21   there is certain programs in place that would affect

22   evaluation of inventory, so the communication would

23   really be with the vendor funding department, and if it

24   required us to do anything different in the inventory

25   system, we would.

**17**

1        Q    And when you assumed responsibility in the
2   vendor funding area in January of 2009, did you have
3   contact with Sony?
4        A    In January, specifically, or after --
5        Q    No, while you were working at Circuit City in
6   the vendor funding function.
7        A    Yes.  I don't remember the first contact,
8   necessarily.  But yes, we had contact in an attempt to
9   reconcile the accounts receivable.
10       Q    And who did you have contact with at Sony?
11       A    It was Tim.  I don't know why I can't think
12  of his last name right now, but it was really through
13  our counsel, initially, at the time.
14       Q    So this may actually encompass the time you
15  were working at the Trust, as well?
16       A    At that point, we weren't a trust.
17       Q    Oh, your initial contact and effort to
18  reconcile was while you were still at Circuit?
19       A    Yes.  We had already liquidated, but we were
20  not a trust at that point.
21       Q    When did you -- if I'm -- I thought you said
22  you started working for the Trust around November of
23  2010?
24       A    Yes.
25       Q    Okay.  So at some point prior to that, you

18

1    started to try and reconcile accounts --

2         A    Correct.  Tim, and Allan is the other

3    gentleman, and I'm sorry I can't remember their last

4    names.

5         Q    And when you say it was through counsel, were

6    you directly speaking with Tim and Allan or were there

7    big meetings where there were lots of people present, I

8    mean, in what setting were you contacting --

9         A    There weren't big meetings, but I believe the

10   way it happened was that our counsel, at the time,

11   reached out to Mr. Barrett, and I don't know who asked

12   for it or if he just volunteered it, but we ultimately

13   provided them with an accounts receivable listing, and

14   initially, we were given some feedback that

15   documentation, additional documentation was needed.  So

16   I provided Tim and Allan with all of the chargeback

17   support, all of the accounts receivable support that

18   ultimately would tie back to what was in the

19   spreadsheet that was provided, and at some point in

20   2010, April or May-ish, we got a spreadsheet back from

21   them that indicated, you know, certain items that they

22   felt were not valid or disputed or that they needed

23   additional information on.

24        Q    Were there continuing reconciliation efforts

25   on your part?

**19**

1      A     It kind of went dead, to be honest, at that

2  point, until we became a trust.

3             MR. GOLDWATER:  All right.  May I have this

4       marked at Sony Exhibit 1.

5             (Sony Exhibit No. 1 was marked.)

6  BY MR. GOLDWATER:

7      Q     Could you take a look, this is -- I show you

8  Sony Exhibit 1.  Do you see it's a notice of deposition

9  with the last page being a list of, the last, the next

10 to the last page being an Exhibit A that has a list of

11 topics, you see that?

12     A     Yes.

13     Q     I understand from your counsel that you're

14 designated to testify on behalf of the Trust for the

15 first four items, is that correct?

16     A     Yes, with the exception of warranty, returns,

17 pricing deductions and shortages, which Heather will

18 cover.

19            MR. GOLDWATER:  Thank you.  Okay, may I have

20       this marked as Sony Exhibit 2.

21            (Sony Exhibit No. 2 was marked.)

22 BY MR. GOLDWATER:

23     Q     Show you what's been marked as Sony Exhibit

24 2.  Do you see that it is Exhibit B to the Trustee's

25 complaint in it's lawsuit against Sony?

**20**

1      A      Yes, sir.

2      Q      Okay.  Were you involved in the creation of

3  this Exhibit B?

4              MR. CAINE:  Can I stop you for a minute?  Is

5        this Exhibit B to the second amended complaint?

6  BY MR. GOLDWATER:

7      Q      Correct.

8      A      I didn't create the exhibit, but I provided

9  the information that ultimately, I believe, created the

10  exhibit, if that makes sense.

11      Q      Okay.  Is it fair to say -- okay, so you were

12  involved in the creation to the extent of providing

13  information that led to the creation of the exhibit?

14      A      Yes.

15      Q      And when was Exhibit B prepared?

16      A      You know what, I'm not sure the exact time

17  when Exhibit B was prepared, but this, the underlying

18  spreadsheets that are in Exhibit B were prepared years

19  ago, with the exception of adding the binder number

20  column, which was added during mediation.

21      Q      When you say years ago, was it in the time

22  period when you were trying to reconcile accounts with

23  Sony that you were telling me about?

24      A      Yes.  Not necessarily for the purpose or

25  during the time of reconciliation, but we, Circuit

1  City, the folks at the Trust, and prior to becoming a

2  trust, created this type of spreadsheet for any vendor

3  that had outstanding receivables.

4      Q    And did you start preparing these

5  spreadsheets after Circuit City had announced its

6  liquidation in mid-January of 2009?

7      A    That I was involved in, yes.

8      Q    Were there people other than yourself who

9  were involved in preparing the spreadsheets that found

10 their way into Exhibit B?

11     A    Not this specific one, other than Greg

12 Lambert, who was part of the Circuit City team that

13 remained in tact after liquidation.  I mean,

14 ultimately, this comes from a much bigger system and,

15 you know, information that goes over many vendors, so

16 he would have been involved in all of that information,

17 not just specific to Sony.

18     Q    What's the bigger system that you're talking

19 about?

20     A    Our vendor receivable system.

21     Q    Okay.  And let's just focus on the

22 chargebacks so we can push away some other items and

23 won't be talking about the same thing.  What data was

24 the spreadsheet relating to chargebacks in Exhibit B

25 extracted from?

22

1       A     What system was it extracted from?

2       Q     Sure, we can start there.

3       A     Okay.  The, basically chargebacks were

4   maintained in a system that we called vendor

5   receivables within Circuit City.  That was our system

6   of record where our receivables, vendor funding

7   receivables were tracked.  That system was fed by a

8   system called VMA, vendor management administration, I

9   believe, is what the acronym stood for.  And so what

10  you see on this spreadsheet, I believe all of these

11  columns came directly from the vendor receivable

12  system, with the exception of the funding description

13  which came from the VMA system, and binder, which I

14  personally added in.

15      Q     Do you know if anyone did any kind of review

16  or quality control review of the data that was in the

17  vendor receivable system or the VMA system?

18      A     Yes, sir.  The vendor funding area, in

19  general, was highly reviewed, scrutinized by the

20  external auditors, so it's just a process that on a

21  quarterly basis was reviewed by them, but also within

22  accounting, within the vendor funding accounting group,

23  that's just something they were tasked with, generally

24  speaking, of insuring that proper controls were in

25  place, things, you know, we didn't record something as

**23**

1   a receivable unless we had the proper documentation in

2   place.  So yes, there was quality control over the

3   data, even as it was recorded in the system, and then

4   when the spreadsheet was prepared, which is basically a

5   data dump from the system, we just tied it back,

6   obviously, to the system to make sure that the two, the

7   dollar amounts were the same.

8        Q    So after the spreadsheet for chargebacks in

9   Exhibit B was prepared, the check that was done was to

10  tie the amounts back to the system?

11       A    Yes.  The data came from the system, but yes.

12       Q    I understand.  I'm just asking what you did

13  after you created the spreadsheet for Exhibit B.  Okay.

14  Did the information that was in the vendor receivable

15  system, was it fed in from the VMA system?

16       A    Yes.

17       Q    And so I'll understand, the VMA kept track of

18  chargebacks?

19       A    Yes.  It kept track of vendor funding

20  information, in general, so product addendum, product

21  exhibits, things of that nature were entered into the

22  system, but ultimately, chargebacks were created in

23  somewhat of a draft state until Circuit City performed

24  whatever they needed to perform to earn the chargeback

25  or those, you know, a specific promotion date had

**24**

1    occurred, then those items would be approved, once the

2    proper documentation had been provided to accounting,

3    it would be approved, and then interfaced over to the

4    vendor receivable system.  I don't know if that answers

5    your question.

6         Q    I know that you are referring to this system

7    as the vendor receivable system.  My question is, was

8    the, is going to be a little bit different.  While

9    Circuit City was still operating its retail stores, did

10   Circuit City make accounting entries with respect to

11   chargebacks, other than the information that got put

12   into the vendor, the VMA system?

13            MR. CAINE:  Objection.

14            THE WITNESS:  Could have.  If, for example, a

15        buyer said, oops, I forgot to put this chargeback

16        in VMA, but we, you know, I'm just throwing out an

17        example, but we advertised this product in

18        accordance with this program, so we need to make

19        sure the entry is booked in this accounting

20        period, then again, if all the T's were crossed

21        and the I's were dotted, and the documentation was

22        appropriate, then yes, there could have been an

23        entry directly to the general ledger that didn't

24        start at VMA and go to receivable.  But

25        ultimately, someone would go back and create that

1        audit trail, if you will.

2   BY MR. GOLDWATER:

3        Q     And did the vendor receivable system feed

4   into an accounting, account or ledger or sub-ledger

5   maintained by Circuit City?

6        A     Yes.   The vendor receivable system is

7   basically the sub-ledger for receivables, but it fed

8   the general ledger, which would obviously, ultimately

9   be reflected on the financial statements.   It also

10  interfaced with our merchandise payable system, which

11  is how we ultimately collected for the receivables from

12  vendors.

13       Q     Did Circuit City make any, and I'm talking

14  about, again, while Circuit City was still operating

15  its retail stores.   Did Circuit City make any

16  accounting entries in an accounts payable ledger or

17  account with respect to a chargeback?

18       A     The way it worked was that the receivable

19  system interfaced with the payable system, and when

20  those chargebacks interfaced, ultimately, what would

21  happen is, for any vendor, but specifically for Sony,

22  those chargebacks would be used as offsets against

23  outstanding invoices; therefore, reducing, ultimately,

24  the payment to Sony.

25       Q     Okay.   Is it fair to say that chargebacks

1   would act as a debit to Circuit's accounts payable

2   account?

3       A    Yes.  There were instances where we collected

4   chargebacks via check.  So in that case, it wouldn't

5   have -- they would remain in a receivable state until

6   we received the check, and then we would clear the

7   receivable, but generally speaking, for Sony, they were

8   offset via the invoice and would be a debit to

9   payables.

10      Q    The check instances that you're telling me

11  about, those are not Sony instances, those are other

12  vendors?

13      A    I don't want to tell you that it's never

14  happened with Sony, because there's been so many

15  chargebacks over, you know, the history of the

16  relationship between the two, but I have seen that we

17  have received checks for receivable that did not flow

18  through payables from vendors in general.

19      Q    I understand, and as you sit here, all I'm

20  asking you is whether you were aware of an actual

21  instance in which Sony sent a check in exchange for a

22  chargeback?

23      A    Not in exchange for a chargeback, but I do

24  believe they sent checks to Circuit City if the vendor

25  flipped into what we called a debit balance.  It could

**27**

1  have been a result of the difference between the

2  payables balance and the credits outstanding that have

3  been based on returns.  I mean, there's a lot of

4  different scenarios.  I can't think of one in

5  particular, but it could have.

6      Q    No, I understand it could have.  I just

7  asked, do you think that happened with respect to Sony,

8  that it flipped into a debit balance?

9      A    I'm not sure.  I mean, I don't know what

10  period of time, specifically, you're asking about.  I

11  don't recall any in the last, say, couple of years that

12  Circuit City was in business.

13      Q    Who was it who was responsible for accounting

14  for chargebacks at Circuit?  Was it the same people you

15  told me about in the VMA group?

16      A    In the vendor funding group, yes.

17      Q    I'm sorry, the vendor funding group.

18      A    Yes.

19      Q    By the way, when there is a, when a

20  chargeback is recorded, and it serves as a debit to the

21  accounts payable account, is there a corresponding

22  entry somewhere else in the ledger?

23      A    Yes.  When it moves from the receivable over

24  to the payable system, then it would offset the

25  receivable.

28

1      Q      Okay.  While Circuit City was operating its

2   retail stores, did Circuit City keep records of its

3   accounts payable that it owed to vendors?

4      A      Yes.

5      Q      And did Circuit have at that time, the

6   ability to generate an accounts payable report with

7   respect to a particular vendor like Sony?

8      A      Yes.

9      Q      And I want to show you a document.  May I

10  have this marked as Exhibit 3, please.

11             (Sony Exhibit No. 3 was marked.)

12  BY MR. GOLDWATER:

13     Q      Okay.  Show you a document marked as Sony 3.

14  These are excerpts of a very large spreadsheet the

15  Trust produced to us.  It was just hundreds of pages,

16  so this is not every page of it, but I just wanted to

17  ask you a couple of questions about it.  Is this an

18  example of an accounts payable report that Circuit had

19  the ability to generate with respect to Sony?

20     A      Yes.

21     Q      Okay.  And if you'll look several pages in,

22  do you see there is a page that's closer to the back

23  than the front, but there's a page marked CCLT02148?

24     A      Yes.

25     Q      Okay.  Do you see in column D, that there are

29

1    several entries that start with the letters AV, and

2    then a number?

3         A    Yes.

4         Q    Are those entries reductions in Circuit

5    City's account payable to Sony?

6         A    Yes.

7         Q    Okay.  And is the reason for those reductions

8    chargeback credits?

9         A    Yes.

10        Q    Okay.  While Circuit was still operating its

11   retail stores, did Circuit keep records of its accounts

12   receivables?

13        A    Yes.

14        Q    And did Circuit have, at this point in time,

15   the ability to the generate accounts receivable report

16   with respect to a particular counter-party?

17        A    Yes.

18        Q    And at this point in time, did Circuit

19   maintain an account receivable ledger or sub-ledger

20   with respect to Sony?

21        A    Yes.

22        Q    Okay.  And did Circuit ever generate an

23   account receivable report with respect to Sony while it

24   was still operating its retail stores?

25        A    Yes.  Circuit would have generated a

30

1    receivable report for all vendors.

2        Q    Have you ever seen an account receivable

3    report with respect to Sony that was generated while

4    Circuit was still operating its stores?

5        A    Yes.

6        Q    Okay.

7        A    With respect to all vendors, not just Sony.

8    Sony would just happen to be a line item on the report.

9        Q    And would the Trust have the ability to

10   generate that report from Circuit City's records today?

11       A    For what period of time?

12       Q    2008, 2009?

13       A    For all vendors or for Sony, specifically?

14       Q    For Sony, specifically.

15       A    Yes.  That's how this was created, Exhibit 1,

16   I believe.  Is that right?

17            MR. CAINE:  Look at the exhibit number.

18            THE WITNESS:  Exhibit 2, sorry.

19   BY MR. GOLDWATER:

20       Q    Okay.  And do you happen to know if the Trust

21   had produced any such account receivable report with

22   respect to Sony in this lawsuit?

23       A    Produced to Sony?

24       Q    Correct.

25       A    Yes.

31

1      Q    So it's -- okay.  What does it look like?

2  Will it be will -- will it have a cover page that's

3  similar to Exhibit, Sony Exhibit 3, where it will say

4  Sony AR data?

5      A    No.

6      Q    Well, how would we recognize it?  What will

7  it look like on the front?

8      A    It will look like Exhibit 2, minus if it were

9  to come directly from the system, it would not have

10  this AR summary page.  I created this AR summary page

11  to just summarize the data that came from this system.

12  So it would look like the pages that follow before you

13  get to warranty, et cetera.

14      Q    Pages 5 through 11 of Exhibit 2?

15      A    Yes.  The exception being that column that

16  says funding description, because that was really added

17  to make it easier for Sony and Circuit City to

18  understand what each of the line items are.  That

19  information is in the actual chargeback documents that

20  were produced to Sony and provided, you know, whenever

21  they were billed, those documents would include this

22  funding description, but our vendor receivable system

23  didn't maintain that particular column of information.

24      Q    Do you know if the Trust has produced that

25  kind of report in addition to what we have as part of

1    Exhibit B to the complaint?

2         A    What do you mean by that type of report?

3         Q    The Sony account receivable report that you

4    were just telling me you could generate from the

5    records maintained by the Trust?

6         A    Since we became a trust?

7         Q    Correct.

8         A    I'm not aware of it.  I believe we provided a

9    spreadsheet very similar to this one.

10        Q    Okay.  Okay.  Looking at this Exhibit 2, and

11   looking at that cover page that's page 3 of 76, did you

12   say you prepared this page?

13        A    Yes.

14        Q    And what does AR mean in the context of AR

15   summary there?

16        A    Accounts receivable.

17        Q    And you're saying that was generated from the

18   accounts receivable report with respect to Sony?

19        A    This cover page?

20        Q    I'm sorry, the chargeback and data that

21   follows it.

22        A    Right.  The chargebacks came directly from

23   the vendor receivable system, with the two

24   modifications that I noted previously, which are the

25   binder number column, and the funding descriptions,

33

1    which came from VMA.

2         Q    How hard would it be to print out that report

3    minus the columns that you told me about?  Is that

4    something you --

5         A    It's not a printable report.  It's just

6    something you query, dump it into Excel, and then I can

7    print it.

8         Q    I see.

9              MR. GOLDWATER:  It's not a question for you,

10        but it's for counsel.  I don't think we've

11        actually seen that, and so we'll request it.

12             MR. CAINE:  You haven't seen what?

13             MR. GOLDWATER:  This underlying report of

14        which Exhibit B was prepared.

15             MR. CAINE:  I think we produced everything

16        that was in the binder, including this.

17             MR. GOLDWATER:  I don't know what binders

18        you're talking about.  I'm talking about the

19        report that Ms. Fose has told us about.

20             THE WITNESS:  It's this, minus these two

21        columns.  That would be the only difference.

22             MR. CAINE:  What is Exhibit 2, I believe that

23        we've produced.

24             MR. GOLDWATER:  I mean, I made my request.

25             MR. CAINE:  Okay.

34

1            MR. GOLDWATER:  Do what you want with it.

2    BY MR. GOLDWATER:

3        Q    Okay.  When you assumed your vendor funding

4    responsibilities in January of 2009, did you already

5    know what chargebacks were?

6        A    Yes.

7        Q    And how did you learn about chargebacks?

8        A    Well, I had been with the company since 1997,

9    through one, internal audit.  We kind of knew a little

10   bit about everything going on within accounting and the

11   company, itself.  I had worked in inventory accounting

12   before, as I mentioned, which has always worked with

13   vendor funded accounting, and again, through my more

14   recent work with inventory accounting.

15       Q    Did you ever have, before you assumed

16   responsibility for vendor funding in January of 2009,

17   did you have any responsibility for processing or

18   submitting chargeback claims?

19       A    No.

20       Q    I know you told me that Mr. Lambert at some

21   point helped you with some vendor funding items after

22   Circuit announced its liquidation.  Have you consulted

23   with anyone else who was in that department to help you

24   with vendor funding work?

25       A    Vendor funding work in general or specific to

35

1   Sony?

2       Q    Specific -- well, in general.

3            MR. CAINE:  Objection.

4            THE WITNESS:  Consulted with, I can't -- can

5       you be more specific?

6   BY MR. GOLDWATER:

7       Q    Sure.  Have you spoken to anybody who used to

8   work in the vendor, VMA function at Circuit to help you

9   with your work in, for the Trust?

10      A    Since Circuit City liquidated?

11      Q    Correct.

12      A    Greg actually reported to me, until maybe

13  July of 2009-ish, I think.  So obviously, I worked with

14  him.  There were two other folks that worked under

15  Carole Elliott that also assisted with vendor funding,

16  in general.  I don't recall anything specific to Sony.

17  Cyndi Lucente, L-u-c-e-n-t-e, and I believe she spelled

18  Cyndi, C-y-n-d-i, and John Michael.

19      Q    Understanding that you weren't working in the

20  VMA function, I'm going to ask you questions about the

21  process by which Circuit submitted chargeback claims.

22  So while Circuit City was still operating its stores,

23  how did Circuit City determine whether it was entitled

24  to claim the chargeback?

25      A    Can I just correct you on one thing, it's not

36

1    the VMA area, it's the vendor funding.  They're not the

2    same thing.

3         Q    My mistake.  I'm sorry.

4         A    Okay.  I just wanted to clarify.

5         Q    Thank you.

6         A    Well, when I took over in January of 2009,

7    because so many people had been let go, like I said,

8    one of the first things we were tasked with was getting

9    our arms around what outstanding receivables we had,

10   and insuring that anything that hadn't been billed to

11   the vendor was billed to the vendor.  So because the

12   billers, for lack of a better term, had been let go, I

13   was responsible for calling each of them back and

14   having them come back in, gather the appropriate

15   documentation, and ultimately bill all the vendors that

16   had chargebacks that were not billed at that point in

17   time.  So I'm very familiar with that process.  And the

18   process that leads up to that is really working with

19   the buyers, insuring that we have the appropriate

20   documentation in place, and if that documentation is in

21   place, then accounting would approve the chargeback and

22   then that ultimately would be how the bills were

23   generated and then submitted for the most part via

24   e-mail from the billers within the vendor funding

25   group.

37

1      Q    Okay.  Thank you.

2      A    Sure.

3      Q    That's a very fulsome answer.  I'm asking you

4   a much smaller question about, let me try to break it

5   down a little bit.  Who in the first instance had the

6   responsibility of determining whether Circuit was

7   entitled to claim a chargeback from Sony, was it the

8   buyer?

9           MR. CAINE:  Objection.

10          THE WITNESS:  I'm not sure I understand the

11      question totally.  In the first instance, meaning

12      they created the chargeback?

13   BY MR. GOLDWATER:

14      Q    That's fine.  I'll withdraw it.  How did

15   Circuit determine whether it was entitled to claim a

16   chargeback?

17      A    I guess starting, what I would consider the

18   beginning of the process.  Sony and the buyer would

19   have communication.  There would be an offering,

20   whether it be a program letter, a full product

21   addendum, which is more formal, obviously.  There were

22   things called sales news, and other, like, promotion

23   announcements that would go out to the buyers.  There

24   may just be e-mail communication between the buyers and

25   Sony representatives, where Sony would say, we will

1   offer X, and I'll just give an example.  For every unit

2   you sell from January 1st through January 31st, we'll

3   give you $10 a unit.  And then the buyer would create a

4   chargeback based on that, with the appropriate dates,

5   the dollar per unit, the specific model that it related

6   to.  And then once that time had passed, so at that

7   point, January 31st, there would be a look at what

8   sales had actually occurred during that time for that

9   model, a calculation would be done in VMA that would be

10  pretty simple math, $10 per unit, times the number of

11  units sold, and that would be the ultimate chargeback.

12  When it came to accounting to be processed, it would

13  have to have whatever it is, the program letter, the

14  e-mail from Sony, whatever it is that supported the

15  general idea of the program itself, as well as what

16  Circuit City did to, I guess, entitle them to that

17  funding.  And in that instance, it would be what were

18  your sales for that period of time.

19       Q    Who was the person who determined whether

20  Sony had done the things it was required to do to

21  become entitled to the chargeback?

22            MR. CAINE:  Objection.

23            THE WITNESS:  It would be multiple people,

24       really.  I mean, I think it would start with a

25       buyer initiating the chargeback, and then it would

1        be someone in vendor funding accounting that would

2        look to make sure we actually did what we were

3        suppose to do, more like a control process.  And

4        depending on the dollar amount, it may rise to

5        another level.  So for example, and I don't

6        remember what the dollar thresholds were, because

7        that really wasn't in, something I was involved

8        in, but at certain dollar amounts, it would

9        require not just the folks in the vendor funding

10        group to approve, but also Carole Elliott may have

11        to approve.  If it's over another dollar amount,

12        then Michelle Mosier may have had to approve.  So

13        it was something that there was, you know, an

14        approval process in place within accounting.

15   BY MR. GOLDWATER:

16        Q    Okay.  A Sony chargeback program, I take it,

17   was typically in effect between a specified start date

18   and a specified end date?

19        A    It would depend on the type of program, but

20   in the example I gave, sales-based, sometimes referred

21   to as sales news, sometimes referred to as trailing

22   credit, that's how they operated.  It would be a

23   certain period of time, a start date and an end date,

24   generally, for specified one or more brand models.

25        Q    Okay.  So you've told me that, obviously,

1   Circuit had to do whatever the program called for it to

2   be to be entitled to a chargeback.  Did Circuit also

3   have to submit the chargeback to Sony to become

4   entitled to it?

5             MR. CAINE:  Objection.

6             THE WITNESS:  To get paid, I would say yes.

7        I think they were entitled to it when they

8        performed the task or the triggering event that

9        was required according to the program.  Sony was

10       certainly aware of the programs that they had

11       offered, and I have seen documents where they

12       would actually reach out to Circuit City and ask,

13       where's the chargeback for a specific program,

14       because it affected their forecast, according to

15       the documents, their revenue forecast.  So there

16       was, I think, constant communication between the

17       Circuit City and Sony to insure that, you know,

18       Sony was, or that Circuit City was actually

19       billing for the programs that Sony had offered.

20   BY MR. GOLDWATER:

21       Q    So is there anything other than performing

22   the program requirements, and either submitting a claim

23   to Sony or somehow advising Sony that you had done what

24   was called for, are those all the things that Circuit

25   had to do to be entitled to a chargeback?

41

1              MR. FEINSTEIN:  Objection.

2              THE WITNESS:  That's my understanding.  Yes.

3    BY MR. GOLDWATER:

4        Q    There's nothing else that you're aware of

5    that Circuit had to do?

6        A    No, sir.

7        Q    And when you assumed responsibility for

8    vendor funding in January of 2009, was there any change

9    in how Circuit determined whether it was entitled to a

10   chargeback?

11       A    Not that I'm aware of, no.

12       Q    Was there any change in the way Circuit

13   submitted claims to Sony?

14       A    No.  The only change, really, was the fact

15   that we were missing some billers for a couple of weeks

16   until we had to call them back in and have them go

17   through the billing process.  There may have been, you

18   know, certain buyers that could have been involved with

19   Sony, specifically, that were let go, and other buyers

20   may have had to jump in and offer assistance, but the

21   process didn't change.

22       Q    When you're talking about billers, are those

23   the people who worked in the vendor funding function?

24       A    Yes.  There were a lot of different people in

25   the vendor funding that had a lot of different

42

1   responsibilities, and billers, I'm sure, isn't their

2   exact title, but that's what they did.  They billed the

3   vendors.

4        Q     Gotcha.  Okay, could you take a look at

5   Exhibit 2, Exhibit B to the second amended complaint.

6        A     Sure.

7        Q     Could you turn, please, to page 5 of 76.

8        A     Yes.

9        Q     All right.  Do you see there are column

10  titles across the top of this page?

11       A     Yes.

12       Q     And do you see that the fifth from the left,

13  fifth column from the left is titled trandate, T-r-a-n-

14  d-a-t-e?

15       A     Yes.

16       Q     What is that date?

17       A     That's a good question.  The transaction date

18  relates to processing within the vendor receivable

19  system.  Often when chargebacks are pushed from the

20  vendor receivable system to the payable system, a

21  trandate, you know, will be populated at that point.

22  That really has to do with kind of the last, I guess,

23  modification date, if you will.  So the last time this

24  receivable item was touched within the vendor

25  receivable system.

**43**

1       Q    How does the -- let me just ask you this

2    question.  Would the last time it's touched within the

3    vendor receivable system be when the claim gets sent

4    out to Sony?

5       A    When it gets billed?

6       Q    Yes.

7       A    Not necessarily, no.  Because the VMA

8    interfaces with vendor receivables.  So that could be

9    the last time it's touched.  I mean, if there's no

10   reason to go back and make any change, it could be that

11   after it's billed, I've seen documents where Sony

12   and/or any other vendor could come back and say we

13   don't agree with this.  Our sales show you sold 152

14   units, you billed us for 200 units, so I need you to go

15   in and you need to modify the chargeback and resend it

16   to us.  So at that point, the receivable would be

17   adjusted, and the transaction date should be updated to

18   reflect that.

19      Q    Okay.  In order for the trandate to show a

20   date, I take it something has to be entered into

21   Circuit's accounting system?

22      A    Well, it interfaces from VMA into the vendor

23   system, so I think that's the initial transaction date.

24      Q    Okay.  The only -- there's only one -- is

25   that what this stands for, by the way, transaction

44

1  date?

2      A    Yes.

3      Q    I see.  And what's the transaction that

4  you're referring to when you tell me about the

5  trandate?

6      A    In that instance, it would be the transaction

7  of a chargeback going, and interface happening between

8  VMA and the vendor receivable system.

9      Q    And at what point in the process of claiming

10  a chargeback is there an interface between the VMA and

11  vendor receivable system?

12      A    I believe that occurs on a monthly basis, and

13  what I'm not sure of, to be honest, and unfortunately,

14  I don't have an IT manual that tells us all the

15  different date triggers in the system, but I assume it

16  picks up this date from the VMA when it interfaces,

17  because as you can see, they're not month-end dates,

18  and the interface would have happened on a monthly

19  basis.

20      Q    I'm not sure that you actually answered the

21  question.  Is there -- what is the event that happens

22  that causes the trandate to be entered in the system?

23      A    It's no entered.  It's systematic.  So when a

24  chargeback moves from VMA into receivables, there would

25  be a transaction date.  I believe that transaction date

**45**

1    comes from the VMA system when it was last touched,

2    let's say approved or whatever the state is.  If the

3    chargeback were then to be moved over to the payable

4    system, it should get a new transaction date, meaning

5    when it interfaces.

6         Q    Okay.  You're getting too complicated for me.

7         A    Sorry.

8         Q    Just trying to stick with one stage at a

9    time.  So the last time somebody makes an -- when the

10   VMA system is completed, then there is an interface

11   with the VR system, is that correct?

12        A    Yes.

13        Q    And that date, it shows up as the trandate in

14   this spread sheet?

15        A    That's my understanding.

16        Q    Okay.

17        A    But what I was trying to say is that we don't

18   have, like, a vendor receivables IT manual, which would

19   be what would really tell you about dates, which are

20   kind of like an IT audit function within a system, but

21   that's my understanding.  It's not a date that you're

22   going to see on the chargeback support.  It's a system

23   date.

24        Q    Okay.  Do you see the, I guess that's the

25   seventh column from the left in Exhibit 2?

1      A      Yes.

2      Q      Is titled "type"?

3      A      Yes.

4      Q      And I know from an interrogatory answer that

5  you said that Circuit City added this column for trust

6  reference to distinguish between a chargeback and a

7  rollback?

8      A      Yes, you're correct.  I missed that earlier

9  when I said what came from the system, but yes, I would

10 have added that column.

11     Q      While Circuit was still operating its retail

12 stores, did Circuit's records draw any distinction

13 between a chargeback and a billback?

14     A      Yes.  I believe that the column that says

15 rectype, which is one, two, three columns over, I

16 believe all double A's are chargebacks, and then

17 there's some other designation, which escapes me right

18 now, for billbacks.

19     Q      And what is the distinction between a

20 chargeback and a billback?

21     A      Billbacks, generally speaking, are set up at

22 the actually inventory receipt level.  So there's

23 typically like an overarching program that says for

24 every one of this particular item that you purchase, we

25 will give you three percent, or we will give you $10

**47**

1  per unit, and that just goes on every time you purchase

2  it, that's what you get.  So internally, I can't really

3  tell you why they decided to call it a billback, but

4  that's what it's called.

5      Q    Is there any accounting significance as to

6  whether a claim as described is charged as a chargeback

7  or a billback?

8      A    The significance, really, is that it occurs

9  at the point of purchase or at the point of receipt, so

10  it's automatically reflected in the value of the

11  inventory.  So it would be a reduction to the inventory

12  value that Circuit City carried on its books.

13      Q    And it would be a debit to the account

14  payable?

15      A    Yes.  Well, no, no, no.  Not a debit to the

16  payable.  What happens is the value of the inventory is

17  reduced.  You're not necessarily debiting accounts

18  payable, because the -- you're debiting receivable.

19  You see what I mean?  So you get an invoice, and that's

20  what would be reflected in accounts payable, but this

21  billback, just the three percent, let's use that as an

22  example, that would be a reduction to inventory and an

23  increase in your receivables.

24      Q    You see the, I think it's the ninth column to

25  the left, titled net receivable?

**48**

1        A     Yes.

2        Q     What was a net receivable?

3        A     It's just the dollar amount of the chargeback

4     or a billback.

5        Q     Was there actually any netting involved in

6     this?

7        A     Not that I'm aware of.  I'm not really sure

8     why the system uses that title.

9             MR. GOLDWATER:  Okay.  I want to just go over

10        in some more details these headings.  Can you mark

11        that as Sony 4, please.

12            (Sony Exhibit No. 4 was marked.)

13            THE WITNESS:  Any chance we could take a

14        quick break?

15            MR. GOLDWATER:  Oh, yeah, sure.  Absolutely.

16        We'll do it right now.

17            THE WITNESS:  Thank you.

18            (Brief recess was taken.)

19     BY MR. GOLDWATER:

20        Q     Before we broke, I was asking you about the

21     net receivable column there.

22        A     Yes.

23        Q     And is the -- and you were telling me that it

24     refers to the amount of the chargeback, is that right?

25        A     Yes.

1    Q    Okay.  And was that amount put there, did the

2 amount of the chargeback reflect the amount of the

3 chargeback, regardless of any purpose to which the

4 chargeback could be put?

5         MR. CAINE:  Objection.

6         THE WITNESS:  I'm not sure I understand.

7 BY MR. GOLDWATER:

8    Q    Sure.  Take a look at, take a look at the

9 fifth funding description line down.  Do you see it

10 says $50 trailing credit to help sell through, and it

11 has a model number?

12   A    Yes.

13   Q    And there's another reference, I guess, two

14 lines later, the seventh line down for Sony support of

15 trailing credits on certain model numbers?

16   A    Yes.

17   Q    And do you have an understanding of what's

18 meant by a trailing credit?

19   A    Yes.

20   Q    And what's your understanding?

21   A    My understanding is it's where Sony would

22 provide a specified dollar amount per unit sold over a

23 specified time frame.

24   Q    And you're not aware of any restrictions on

25 the use or application of the credits?

50

1        A     No, I'm not.

2        Q     Okay.  So if Sony -- if a Sony program

3   offered $100 in trailing credits, would Exhibit B list

4   $100 as the amount of the receivable due from Sony?

5              MR. CAINE:  Objection.

6              THE WITNESS:  Yeah, I'm not sure I'm

7        following you.

8   BY MR. GOLDWATER:

9        Q     I'm just trying to understand, since you -- I

10  asked you if you knew of any limitations on the use of

11  a trailing credit, and you told me that you didn't.

12       A     Right.

13       Q     So now I'm asking you, does that mean if Sony

14  offered $100 in trailing credits as the benefit in a

15  program, when -- for purposes of creating -- and

16  Circuit City then fulfilled the program requirements,

17  the $100 would be the amount of the net receivable that

18  Circuit would put in Exhibit B?

19       A     Yes, if that's the total of the dollar per

20  unit times the number of units sold is $100, then yes.

21       Q     Yes, okay.  So whatever the amount of the

22  benefit of the program, you would put it in regardless

23  of any, anything else about it?

24       A     Yes.

25       Q     Do you see the line just to the right of net

51

1   receivable, has the title pre, p-r-e, slash post,

2   p-o-s-t?

3        A    Yes.

4        Q    And I know from the interrogatory answers

5   that this is, it says this is a Circuit City internal

6   reference to distinguish pre versus post petition, does

7   that sound right?

8        A    Yes, yes.

9        Q    And is that reference to petition a shorthand

10  for the date of Circuit City's bankruptcy petition?

11       A    Yes.

12       Q    How did the Trust determine whether a

13  chargeback was a pre or post petition chargeback?

14       A    It would be based on the earn or effective

15  date, depending on what you want to call it, for the

16  individual chargeback.  So if the chargeback were

17  written for January 1st, 2009 through January 10th,

18  2009, that would be post-petition.  If it were prior to

19  bankruptcy dates, it would be pre-petition.

20       Q    So was the only event that had to occur

21  before the petition date, Circuit City's performance of

22  the program requirements?  Is that what made something

23  a pre-petition chargeback?

24       A    Yes, the performance.

25       Q    And so in a situation where Circuit satisfied

1    program requirements before the petition date, but

2    submitted a claim to Sony after the petition date, did

3    the Trust classify that as a pre-petition chargeback?

4        A    Yes.

5        Q    And what was the rationale for that?

6        A    The performance occurred prior to the

7    bankruptcy, so it was earned pre-petition.

8        Q    Was there anybody who was responsible for

9    making determinations whether chargebacks should be

10   categorized as pre or post-petition?

11       A    The vendor funding group, when they were

12   looking at the support, always, dates were something

13   they would review.  So if there were any performance

14   dates that, you know, were post-petition, and for some

15   reason the chargebacks were marked as pre-petition,

16   then obviously, that would be a question mark, and they

17   would ultimately correct it, but the buyers had a hand

18   in it, but ultimately, accounting would have been

19   responsible for the final determination.

20       Q    So obviously, Circuit had to satisfy the

21   program requirements before it would be entitled to a

22   chargeback, right?

23       A    Yes.

24       Q    Did Circuit have to submit a claim to Sony

25   before it became entitled to a chargeback?

1              MR. CAINE:  Objection.

2              THE WITNESS:  I believe we were entitled at

3         performance.

4    BY MR. GOLDWATER:

5         Q    Okay.  Do you know if there was any

6    requirement that Circuit submit a claim to Sony to

7    become entitled to a chargeback?

8              MR. CAINE:  Objection.

9              THE WITNESS:  I'm not aware of any

10        requirement, but through the review of just

11        documents in general related to this case, I have

12        seen e-mail communication, I believe it was just

13        within Sony, that discussed that there was a one

14        year time frame to submit the chargeback.

15        However, they -- I saw documents where they were

16        pushing for us to give them the chargebacks,

17        again, because of the impact on their revenue

18        forecast.

19    BY MR. GOLDWATER:

20        Q    Could you read back my question?

21             (Court Reporter read back, "Do you know if

22             there was any requirement that Circuit submit

23             a claim to Sony to become entitled to a

24             chargeback?)

25

54

1    BY MR. GOLDWATER:

2        Q    Is the answer to that one that you're not

3    aware of any such requirement?

4              MR. CAINE:  Objection.

5              THE WITNESS:  I've seen documents where it's

6         been discussed, but I'm not aware of any hard fast

7         rule, for example, when I took over vendor funded

8         accounting, where anyone said, you need to get

9         these chargebacks out within X number of days.

10   BY MR. GOLDWATER:

11       Q    Okay.  If a Sony program was in effect for a

12   period of time that was both before and after the

13   petition date, how did the Trust classify that

14   chargeback?

15       A    It would be split.  They would calculate what

16   portion was earned pre-petition, what portion was

17   earned post-petition.

18       Q    Again, based on Circuit's performance as

19   opposed to when a claim was submitted?

20       A    Yes.

21       Q    Did Circuit make the entry into the VMA

22   system when it was entitled to the chargeback?

23       A    Chargebacks were created at a draft state by

24   the buyers before they were entitled, and they just

25   weren't approved and pushed through the process until

1    the performance occurred.

2         Q    Okay.  So after performance is when they were

3    pushed through to the, I'm going to get this wrong, the

4    VR, the vendor receivables account?

5         A    Yes.

6         Q    Thank you.  So by the time that showed up in

7    the vendor receivable account, they had already,

8    Circuit City had already earned the chargeback?

9         A    Right, in the vendor receivable system, yes.

10        Q    Okay.  So now I think if we circle back to

11   that trandate, if that's the date that the VMA entry

12   got pushed through to the VR system, we know that

13   Circuit had earned the chargeback by the trandate?

14        A    I don't want to say that for sure, but in

15   theory, yes.  Again, I think this date, because it

16   doesn't come from effective dates in the chargebacks,

17   and it doesn't come from a bill date on the chargeback,

18   I don't want to say for sure.  But certainly, to get

19   into the vendor receivable system, it had to be

20   approved, which means accounting had felt Circuit City

21   had earned the chargeback.

22        Q    You see the next to last -- I'm sorry, the

23   second column from the right of Exhibit 2, still on

24   this page five of Exhibit 2, it's titled funding

25   description?

1       A     Yes.

2       Q     And I think you told me that this one was

3   added from the VMA, by the VMA department?

4       A     From the system, from the VMA system, yes.

5       Q     I see.  The VMA system had a funding

6   description field and that was added to Exhibit B?

7       A     Yes, because funding description is not in

8   the vendor receivable system.

9       Q     And how did the funding description get into

10  the system?  Was it the buyer who did that?

11      A     Into the VMA system?

12      Q     Yes, I'm sorry.

13      A     Yes.

14      Q     Was the buyer required to provide any

15  particular information in the funding description?

16      A     I don't know that there was a hard fast

17  requirement, but this ultimately shows up on the

18  chargeback documents that are submitted to Sony when

19  the chargeback is billed, and they're all a part of the

20  binders and things we produced.

21      Q     Okay.  Was the buyer required to attach as

22  back-up, the program document?

23      A     Yes, in order for it to be approved.

24      Q     And did Circuit maintain those program

25  documents in their records?

1       A     Yes.

2       Q     So in theory, for each of the chargebacks

3   that are showing up on Exhibit B, there's a program

4   document that corresponds to those?

5       A     Yes.   There's support for every chargeback,

6   and that corresponds to this binder number that was

7   added.

8       Q     Ms. Fose, if you would please take a look at

9   the interrogatory responses that have been marked as

10  Sony Exhibit 4, and if you would, please, turn to page

11  seven.   Just -- I just want to orient you.   These are

12  interrogatory responses provided to us by the Trust in

13  response to a discovery request.

14      A     Sure.

15      Q     Do you see at the bottom of page seven, there

16  is a column title called category, and a description

17  that says CC Trust internal categorization of

18  receivables?

19      A     Yes.

20      Q     I actually never saw that field on Exhibit B.

21  Do you know whether that actually appears on Exhibit B

22  or any version of Exhibit B?

23      A     I actually don't see it on here either, but I

24  know it's in a spreadsheet that I thought we produced.

25  It ties back to the complaint, that section that talks

58

1    about the funding categories.

2         Q    So you have a version of a spreadsheet with

3    similar data to Exhibit B that had a field or a column,

4    I'm sorry, called category?

5         A    Yes.

6         Q    And what are the categories that the Trust

7    allocated receivables among?

8         A    I don't have them memorized, but I know

9    they're in the second amended complaint with, you know,

10   subtotals for each category.  I remember seeing that in

11   there.

12        Q    Who was it who did the allocating among the

13   categories?

14        A    I did it.

15        Q    Is it -- that field was just suppressed for

16   some reason in printing out Exhibit B?

17            MR. FEINSTEIN:  Objection.

18            THE WITNESS:  I can't speak to that.

19   BY MR. GOLDWATER:

20        Q    You don't know why it's not here, in other

21   words?

22        A    No.

23        Q    Do you know if there were other fields that

24   are on a version of the spreadsheet that you have seen

25   that are not visible on Exhibit B to the complaint?

59

1      A     I don't think so.

2      Q     Do you have any recollection of suppressing

3   any fields in that spreadsheet?

4      A     No.

5      Q     Okay.  Would you take a look at the eighth

6   column from the left on page five of Exhibit 2.  It's

7   titled, DESCR.

8      A     Yes.

9      Q     I just want to ask you, about 12 lines down,

10  and again, about 16 lines down, there are some entries

11  that have numbers, followed by the word "void", v-o-i-d

12  in all caps, do you see those?

13     A     Yes.

14     Q     Is there -- what's the significance, if any,

15  of the word "void" in those entries?

16     A     The chargeback was voided, so in order to

17  reflect the appropriate receivable balance, we're just

18  showing a credit where the chargeback amount was

19  reversed.

20     Q     I see.  It's a reverse chargeback?

21     A     Yes.

22     Q     I see.

23     A     Could have been reissued, just FYI.

24           MR. GOLDWATER:  Okay.  If I could have this

25     marked as Exhibit 5.

60

1              (Sony Exhibit 5 was marked.)

2    BY MR. GOLDWATER:

3        Q    Okay.  I show you a group of documents marked

4    as Sony Exhibit 5.  It's a group -- it's a group of

5    documents with Trust production numbers 30119 through

6    30136.  And take as much time as you need to take a

7    look at those.  My question when you're done looking at

8    them is whether these are documents relating to Circuit

9    City chargeback number 97769.

10       A    I'm having trouble reading the last one, but

11   it appears that they are.

12       Q    I had the same trouble.  Would you please

13   take a look at the document with Bate's number 30120 in

14   lower right?

15       A    Sure.

16       Q    You see that's a document titled, chargeback

17   cover sheet?

18       A    Yes.

19       Q    What is a chargeback cover sheet?

20       A    It's just a cover sheet for the chargeback,

21   typically produced as part of the billing.

22       Q    It's part of the standard procedure in

23   processing the chargeback claim, to produce a cover

24   sheet?

25       A    Typically, yes.

61

1      Q    Did Circuit, when it was operating its

2  stores, send the cover sheet to the vendor from whom it

3  was claiming the chargeback?

4      A    Typically, yes.

5      Q    Was there also a cover sheet for billbacks?

6      A    I don't recall.

7      Q    And I take it you wouldn't know the answer to

8  the other categories, I'd have to ask Ms. Ferguson

9  about those?

10     A    Correct.

11     Q    Was vendor -- VMA, did that stand for vendor

12  management administration?

13     A    Yes.

14     Q    Okay.  Was VMA responsible just for

15  chargebacks or for other kinds of claims to vendors?

16     A    VMA is the system, itself, and I think I said

17  this earlier, but there was just general information

18  about the, I guess, relationship between Circuit City

19  and its vendor, which included vendor funding.

20     Q    You did say that.

21     A    Yeah.

22     Q    Okay.  Do you see on page 30120, the first

23  entry says, CB number?

24     A    Yes.

25     Q    Okay.  And is 97769 a number that Circuit

1    City had assigned as a chargeback number to this

2    particular claim?

3         A    Yes.

4         Q    Okay.  And do you see the next -- I'm sorry,

5    the one, two, three, fourth line down says "class"?

6         A    Yes.

7         Q    What did class refer to?

8         A    Class was a Circuit City internal

9    categorization of merchandise product.  So I can't

10   think of one right off the top of my head, but it could

11   be like 42 inch LCD TVs would have had a class, laptops

12   would have had a class.  I don't remember what these

13   two numbers stand for, 217 and 146, but --

14        Q    It's a product class?

15        A    Yes.

16        Q    I see.  Do you see that a couple of lines

17   below class, there is two letters, PP, do you see that?

18        A    Yes.

19        Q    And what did "PP" mean in this context?

20        A    I believe that's price protection, and in

21   this case, the "N" is no.

22        Q    Is it -- I'm just going to ask you this.  Did

23   "PP" ever refer to something called proof of

24   performance?

25        A    I don't this think so, no.

63

1     Q    Do you see under "PP", there is a caption,

2  effective date?

3     A    Yes.

4     Q    Okay.  And here, that's December 27, 2008?

5     A    Yes.

6     Q    And what did the effective date signify?

7     A    In this particular instance, it's the end

8  date of the program.  So it looks like the program ran

9  from 12/14/08 to 12/27/08.

10    Q    Would that be typical for the effective date

11  to be the program end date?

12    A    Should be, in theory, but I don't have them

13  all memorized, so I can't say for sure.  But that would

14  be logical.

15    Q    Do you see under effective date, there's a

16  caption that says "PA", and then there's a symbol for a

17  number?

18    A    Yes.

19    Q    And what does the "PA" number refer to?

20    A    Product addendum.

21    Q    And do you see below that there is a "PE"

22  sign, or then a sign for number?

23    A    Yes.

24    Q    And what did that refer to?

25    A    Product exhibit.

**64**

1       Q     And just for the record, can you tell me what

2   you understood a product addendum to be?

3       A     The majority of the product addendums that

4   I've seen refer to specific programs.  Typically,

5   there's a product addendum associated with a billback

6   because it's, like I said, an overarching program that

7   kind of goes over a longer period of time than say an

8   individual chargeback like this one that's only for a

9   couple of weeks or whatever.

10       Q     And what --

11       A     It's basically a program document, if you

12   will, program agreement.

13       Q     Thank you.  And what is a product exhibit?

14       A     That is where specific products may be

15   listed, so specific models.

16       Q     Do you see under the last caption on that

17   page, it says "origin"?

18       A     Yes.

19       Q     And what is that a reference to?

20       A     Each of these pages is something different,

21   like the confirming letter is the page that follows,

22   030121, the support starts, I guess that's up for

23   interpretation, but I would say it starts with 030123,

24   and then the billing memo, which I actually don't see

25   here -- well, they're kind of one in the same.  Here we

65

1   go.  This billing, this letter right here, 030121

2   typically went out with the bills.  I don't know that

3   it's really any different from the confirming letter,

4   to be honest.  I don't know why there's different check

5   boxes.

6        Q    So I'm understanding, the confirming letter

7   could also serve as the billing memo?

8        A    Yes.

9        Q    And that's what happened, at least appears

10   that's what happened here?

11        A    Yes.

12        Q    Okay.  And one last question about the cover

13   sheet.  Do you see on the lower, right-hand corner, it

14   bears a date, January 23, 2009?

15        A    Yes.

16        Q    And what does that signify in this context?

17        A    If you look at 030123, there is a finalize

18   date and a last changed date, and those two are the

19   same.  So my assumption is that's when the chargeback

20   was finalized.

21        Q    Was the cover sheet generated when the

22   chargeback was finalized?

23        A    Should have been, yes.  This is a systematic

24   date, it appears.

25        Q    Okay.  Going to the confirming letter that

66

1    you identified.  That's that document, 30121.

2         A    Yes.

3         Q    That's -- was it Circuit City's practice to

4    send a confirming letter to a vendor with respect to a

5    chargeback?

6         A    Yes.  Generally, a billing would include all

7    of these VMA documents that you see, 030121 through

8    030125.  Those are system generated documents, and then

9    the documents that follow that, the e-mails, et cetera,

10   would also be included with the bill.

11        Q    So Circuit would actually send not just the

12   cover sheet and the confirming letter, it would also

13   send the documents through document 125 that you

14   mentioned?

15        A    Yes.

16        Q    Okay.  At the time that Circuit was still

17   operating its stores, did it have a standard format for

18   confirming letters?

19        A    Yes.

20        Q    Okay.  And did the letter from Mr. Hawkins to

21   Sony, that's document 30121, follow or adapt that

22   standard format?

23        A    Yes.

24        Q    And do you see that the next to last

25   paragraph of document 30121, that confirming letter

1    states, quote, payment is due immediately and will be

2    collected via check or wire from the vendor for

3    chargeback number 97769, end quote?

4         A    Yes.

5         Q    And before Circuit filed its bankruptcy

6    petition, did Circuit's standard format for confirming

7    letters say that payment would be collected via check

8    or wire?

9         A    I'd have to look at the documents.  To be

10   honest with you, I've seen it both ways, that, and

11   deducted from payment or invoice.

12        Q    And do you know how it came about that a

13   letter would end with a request for payment in one way

14   versus the other ways that you've seen?

15        A    I believe there's a flag in VMA, and it could

16   have been intentional or unintentional, you know, how

17   the buyers chose which way, you know, which box to

18   check, if you will.  That's where that line fed from.

19        Q    Did you ever see any confirming letters

20   before Circuit's bankruptcy petition that asked for

21   payment via check or wire?

22        A    I've seen others that say it.  I don't recall

23   if it's prefiling.

24        Q    Okay.  And do you recall -- I see.  Okay.

25   You don't recall.  That's fine.  Did Sony ever send

**68**

1    Circuit a payment by check or wire for a chargeback?

2        A    I cannot think of an instance where they did.

3        Q    Did Circuit ever contact anyone at Sony to

4    follow up on a request for payment by check or wire for

5    a chargeback?

6        A    There was definitely contact to follow up on

7    outstanding receivables, but specific to how it would

8    be, whether or not it would be collected via check or

9    wire, I'm not aware of that.

10       Q    Did you ever discuss with anyone whether Sony

11   chargebacks were payable in cash?

12            MR. FEINSTEIN:  Objection.  Well, excluding

13        conversation with counsel.

14   BY MR. GOLDWATER:

15       Q    Sure.

16       A    No.

17       Q    Unless you want me to hear them, it's up to

18   you.  Ms. Fose, could you turn, please, to the document

19   bearing the Bate stamp 30123 in the lower right?

20       A    Yes.

21       Q    Did this document have a name?

22       A    Again, it's just part of the package, if you

23   will, that came standard from VMA for chargebacks.  If

24   it had a name, I don't know what it is.

25       Q    And I think you said this document, too, you

69

1    understand was sent to vendors as a standard practice?

2         A    I believe so, yes.  I know it was sent to

3    Sony because it's in all of our binder documents.

4         Q    Do you see in the upper right-hand corner of

5    document 30123, that it says, status, colon, completed?

6         A    Yes.

7         Q    And what did that mean?

8         A    That the chargeback was completed.

9         Q    And what did it mean to complete a

10   chargeback?

11        A    I believe when the buyer went in and -- your

12   choices, I believe, are draft and completed.  So once

13   it came out of draft, meaning that Circuit City had

14   performed whatever it needed to to earn the funding,

15   then it would be put into a completed state.

16        Q    Do you see on the left side of the page,

17   under the heading for chargeback, it says CR number?

18        A    Yes.

19        Q    Do you know what that was?

20        A    I'm not familiar with that number or even

21   that header.

22        Q    Okay.  Do you see underneath the status

23   completed, a couple of lines down, it says created by,

24   and it says, has Mr. Hawkins' name?

25        A    Yes.

**70**

1      Q     And what did the "created by" line refer to?

2      A     Who created the chargeback.

3      Q     Okay.  And created in this context means the

4   person who put in the information in the first place?

5      A     Yes, into VMA.

6      Q     Into VMA.  Would the buyer typically be the

7   creator of the chargeback?

8      A     Yes.

9      Q     Okay.  And do you see underneath the created

10  by line, there's a line that says "finalized by"?

11     A     Yes.

12     Q     And was there a distinction between creating

13  and finalizing the document?

14     A     Yes.  The finalized would happen once it was

15  approved by accounting.  Rachel was in accounting, so

16  she had -- in vendor funding accounting.

17     Q     And what did accounting do to approve or

18  disapprove?

19     A     As I mentioned before, just really reviewing

20  the documentation and insuring that Circuit City had

21  actually performed whatever they needed to to earn the

22  chargeback.  The dates were accurate, that type of

23  thing, that we had support.

24     Q     Okay.  And is the finalized date that is

25  underneath the finalized by line, what did that refer

71

1   to?

2       A   The date that Rachel finalized the

3   chargeback.

4       Q   Is that the date that the status would change

5   to completed?

6       A   I believe so, but I can't say for sure.

7       Q   And was Circuit suppose to take some action

8   on the date that a chargeback was completed?

9       A   When the chargeback was finalized?

10      Q   Yes, I'm sorry, finalized.

11      A   I assume they're synonymous, but when the

12  chargeback was finalized and approved, then that's when

13  it would be eligible to interface with the vendor

14  receivable system, and ultimately bill the vendor.

15      Q   Is that also the day that the confirming

16  letter would go out?

17      A   In theory.  Like I said, we lost some billers

18  for a while, so.

19      Q   Okay.  If you could just help me out with

20  some of the captions on the left side of the page.  You

21  see there's a caption halfway down called, it says

22  "based on", b-a-s-e-d, on?

23      A   Yes.

24      Q   And what does that refer to?

25      A   In this instance, it's just indicating it's a

72

1    sales-based chargeback.

2        Q    I see.  As opposed to what, what are the

3    other things that you've seen in that column?

4        A    It may just be blank if it's not related to

5    sales at all.  It's based on, you know, an add or

6    something like that.  It just depends on the type of

7    chargebacks.  I don't remember all the different terms

8    that flow through there.

9        Q    Do you see under that, there's an entry, is

10   there a threshold, question mark?

11       A    Yes.

12       Q    And what does that refer to?

13       A    In some instances, there could be chargebacks

14   that are based on obtaining a certain threshold in

15   sales.  This one wasn't.

16       Q    And under that, it says, do you see it says

17   "sales for", f-o-r?

18       A    Yes.

19       Q    What does that refer to?

20       A    It's just explaining that what you see over

21   to the right, just below it, that's what the sales are

22   based on.  They're the sales of class 217 Sony, that

23   specific model, et cetera.

24       Q    Going down a couple of lines, you see it says

25   "sales based on", and it says "written"?

73

1      A      Yes.

2      Q      Can you tell me what that refers to?

3      A      This is when the sale occurred at the, at the

4  point of sale transaction.  In other words, the sales

5  you see above are based on point of sale, transactions

6  from 12/14/08 through 12/27/08, net of returns.

7      Q      You see under that is start date?

8      A      Yes.

9      Q      Is that the first day of the program period?

10     A      Yes.

11     Q      And is end date under that refer to the last

12  day of the program period?

13     A      Yes.

14     Q      Do you see billing frequency is under that?

15     A      Yes.

16     Q      What does that mean?

17     A      In this case, it says immediate, which I

18  assume means get the bill out immediately.

19     Q      What's the -- is the frequency of the billing

20  measured from the date that this document is, that the

21  chargeback is completed?

22     A      To be honest, I'm not sure.

23     Q      Does it ever say anything other than

24  immediate?

25     A      I don't think I've seen it say anything other

**74**

1    than that.

2         Q    Okay.

3         A    That hasn't come up before.

4         Q    Do you see that under that, it says, "payment

5    how"?

6         A    Yes.

7         Q    And what did that mean?

8         A    In this case, it says deduct from AP balance.

9         Q    And was that how Circuit was going to obtain

10   the benefit of the chargeback?

11        A    That's what it says, which is in conflict

12   with the letter, but yes.

13        Q    Okay.  Did Circuit deduct chargebacks from

14   account payable balances?

15        A    In general?

16        Q    When they were entitled to?

17        A    Yes.

18        Q    And how did they implement that?  What did

19   they do in order to deduct a chargeback from an account

20   payable balance?

21        A    Heather can speak more on the specifics to

22   actually what they did in the payables department, but

23   on the receivable side, there was basically a push or

24   an interface from receivables to the merchandise

25   payables department, and from what I've seen, when

75

1  checks were cut, if there were outstanding invoices,

2  and there were also these outstanding credits or what

3  you saw describe in this, Exhibit Number 3, as AV's,

4  then the net of those would be ultimately what was paid

5  to Sony.

6      Q    So it factored into a, the next payment or a

7  subsequent payment from Circuit to Sony?

8      A    Yes.

9      Q    And who would make the determination as to,

10 on the "payment how" line?

11     A    The buyers are who set everything up, really,

12 in VMA.  If they did it accurately every time, I can't

13 attest to that, but that's who would have checked the

14 box.

15     Q    In theory, they were the ones who determined

16 the "payment how" mechanism?

17     A    Yes.

18     Q    And do you happen to know how the buyers

19 would determine the method of payment?

20     A    I don't know.

21     Q    Do you know if it was based on the Sony

22 program document?

23          MR. CAINE:  Objection.

24          THE WITNESS:  Could have been.  Many of the

25     documents I've seen are, don't get into how it's

76

1           going to be, how Circuit City is going to receive

2           the credit.  I have seen some, I recall a specific

3           program document from Sean O'Brien to Circuit in

4           the middle of 2008, I believe it was, where he

5           indicated that Circuit City could use the credits

6           to apply against outstanding AP balance.

7    BY MR. GOLDWATER:

8        Q    Ms. Fose, you did mention that the "payment

9    how" method, just on document 30123 was inconsistent

10   with the confirming letter.  Do you know how that came

11   to be?

12       A    I don't.  They both come from VMA, so I'm not

13   sure.

14       Q    And was the person who was responsible for

15   the confirming letter different from the person who was

16   responsible for the "payment how" entry on 30123?

17       A    I don't think so.  The information on this

18   letter was fed from VMA.  What I'm unsure about is if

19   the biller would have made any modifications to it.  I

20   don't know.

21       Q    Okay.  Going back to that 30123.  Do you see

22   under "payment how", it says vendor payment due, d-u-e,

23   days, vendor payment due days?

24       A    Yes.

25       Q    And what does that mean?

**77**

1        A     In this case, it says zero, so I believe

2    Circuit City felt that the payment was due immediately

3    upon the bill.

4        Q     Okay.  So was the vendor payment due days

5    field the number of days from the submission claim to

6    the vendor, until payment of the chargeback was due

7    from the vendor?

8        A     That's what it appears to be.

9        Q     And do you know how Circuit determined the

10   vendor payment due days?

11       A     I'm not sure.

12       Q     Do you know if Circuit generally took the

13   view that payment was due immediately?

14       A     From what I've seen, yes.

15       Q     All right.  And is it correct that the

16   starting date and measuring the vendor payment due days

17   is the date Circuit sent the chargeback claim to the

18   vendor?

19       A     Say that again.

20       Q     Sure.  Let's do it concretely, so I'll make

21   sure we're both on the same page.  You noted that this

22   document, the vendor payment due days has an entry of

23   zero.  Did a zero entry for vendor payment due days

24   mean that Circuit had an immediate right to payment?

25       A     Yes, it's my understanding.

78

1      Q    In this instance, did that mean that payment

2  for Circuit for this chargeback was due on January 23,

3  2009?

4      A    Yes.  The general practice was that we would

5  deduct it from the AP balance, so immediately, when

6  this interfaced the vendor receivables, ultimately,

7  there would be an interface to payables and would go

8  from there.

9      Q    And so whether Sony did anything or not,

10  Circuit was going to apply that chargeback on a

11  subsequent payment?

12      A    We would apply it to subsequent payment, so

13  long as there was no dispute by Sony.

14      Q    Okay.  And January 23, 2009, was also the

15  date that the confirming letter and chargeback claim

16  was sent to Sony, right?

17      A    Yes.  That's my understanding from the

18  document.

19      Q    All right.  Do you see under, I'm back on

20  30123.

21      A    Yes.

22      Q    Do you see under vendor payment due days it

23  says "allocation on", o-n?

24      A    Yes.

25      Q    What does that mean?

79

1        A      This is just showing the allocation.  It's

2    kind of hard to take one without going to the next one

3    because they're related to each other, but the

4    allocation is the allocation of the total receivable

5    amongst the different classes in this particular case.

6    It's really just an internal reference.

7        Q      Thank you.  So these references under

8    allocation to type and subtype and sales details on the

9    next page and item details and workflow comments, those

10   are all internal Circuit City --

11       A      Right.  I don't think the type and subtype

12   and even class have a ton of meaning necessarily to

13   Sony, but the next page, 30124, certainly they would

14   want to know quantity and amount of unit, because

15   that's ultimately how the final chargeback of 7.4

16   million was calculated.

17       Q      Okay.  Would you turn in this same Exhibit 5

18   to the page with number 30126?

19       A      Yes.

20       Q      You see this is a document that looks much

21   like the one we just looked at, except it says "status

22   draft" in the upper, right-hand corner?

23       A      Yes.

24       Q      What did "draft" mean in that context?

25       A      Just that it was in draft state.  Maybe they

80

1    needed to get some more information.  It's -- I don't

2    know what it meant for this specific one, but it wasn't

3    finalized yet.

4        Q    Okay.  And I take it this would not be sent

5    out, a draft version of this document would not get

6    sent out to a vendor?

7        A    No, but this could have been included in the

8    support that ultimately got sent, but we wouldn't send

9    the draft chargeback until it was a final chargeback.

10       Q    Okay.  You see that on the draft there's a

11   last changed date in the upper right of December 11,

12   2008?

13       A    Yes.

14       Q    And that was before the program start date of

15   December 14, 2008?

16       A    Yes.

17       Q    Was there anything unusual about a buyer

18   starting to process a chargeback before the program

19   start date?

20       A    No.  I believe they would want to have the

21   chargeback set up and ready with the specified start

22   and end dates of the program ahead of time.

23       Q    Okay.  Do you see that this particular page,

24   30126, has a handwritten notation, "hold filing"?

25       A    Yes.

1      Q     Do you have any idea how that came to be on

2   this document?

3      A     I don't.

4      Q     Was there any period of time when, to your

5   knowledge, Circuit was holding off on submitting

6   chargeback claims to Sony?

7      A     The only thing that I know of that was held

8   at one point was based on this, the billing memo or

9   confirming letter that we talked about, because

10  post-petition chargebacks, this paragraph that states,

11  Circuit City confirms and accepts the funding --

12     Q     I'm sorry, what document are you on?

13     A     I'm sorry.  I'm on 030121.  If you were to

14  look at pre-petition chargebacks, this paragraph looks

15  different, because here, we're just stating that you

16  can't apply the post-petition to offset the

17  pre-petition balances due.

18     Q     Okay.  And if you answered this, I apologize.

19  Was there a period of time when Circuit was holding off

20  on submitting chargebacks to Sony?

21     A     I don't know that there was any intention to

22  hold off, other than this cover page was being

23  rewritten.  I don't know if that really kept anything

24  from being held up.  I just remember that the cover

25  page was rewritten, and then the other hold, again, not

82

1    necessarily intending to hold, but when we didn't have

2    billers, there was no one to bill.

3         Q    Okay.  All right.  And this same Exhibit 5,

4    could you turn to the document number 30129?

5         A    Yes.

6         Q    You see that appears to be an e-mail from

7    Mr. Hawkins, dated December 11, 2008?

8         A    Yes.

9         Q    Do you know if this was among the documents

10   that Circuit would, in the ordinary course, send to

11   Sony?

12        A    Yes, as support for the chargeback.  This is

13   what I would view as being the program agreement that

14   follows.

15        Q    Do you see the e-mail is addressed to, among

16   others, VMA chargeback request at Circuit City?

17        A    Yes.

18        Q    And who received e-mails at that address?

19        A    The vendor funding group received e-mails at

20   that address.

21        Q    And were the vendor funding people divided in

22   any way as to what kinds of chargebacks or vendors they

23   dealt with?

24        A    They were, but I don't remember what that

25   division was, to be honest.

1      Q     So if there was a Sony person, you don't know
2  who that was?
3      A     Right.  I don't even think they were done by
4  vendor, I think it was by buyer, like they had a
5  partnership with a specific buyer, from what I
6  remember.
7      Q     Okay.  And do you see that the e-mail is also
8  addressed to CES accounting at Circuit City?
9      A     Yes.
10     Q     And who was -- what was CES accounting?
11     A     That's also vendor funding.
12     Q     The same people who work in CES accounting
13  work in the vendor funding group?
14     A     Yes.
15     Q     And do you see the e-mail was also addressed
16  to David Tuttle, T-u-t-t-l-e?
17     A     Yes.
18     Q     And who was Mr. Tuttle?
19     A     He worked in the vendor funding department,
20  as well.
21     Q     What was his title?
22     A     I believe he was an analyst.
23     Q     Did he have any role in implementing or
24  refining or creating processes for the processing of
25  chargebacks?

**84**

1      A      He would have been involved in working with

2   the buyers to insure we had the proper documentation

3   and to ultimately approve of the chargeback.

4      Q      Okay.  Would you turn within Exhibit 5 to the

5   page with the number 30133.

6      A      Sure.

7      Q      Are you looking at the document that says

8   "chargeback approval checklist" at the top?

9      A      Yes.

10     Q      And what was this document?

11     A      This was an internal document.  I don't

12  exactly know when it was first put into practice, but

13  this was part of the vendor funding folks, I guess,

14  checklist, if you will, to insure that everything was

15  done as it was supposed to, T's crossed, I's dotted,

16  before they approved the chargeback.

17     Q      Do you know if this was part of their

18  standard procedure for chargebacks?

19     A      I don't know if it was for a specified dollar

20  amount, but I know I've seen a lot of these, but not

21  every chargeback has had them.

22     Q      Who was responsible for completion of the

23  approval checklist?

24     A      It would have been whichever vendor funding

25  accounting analyst was in charge of that particular

1  chargeback.

2      Q    And was the purpose to make sure that the

3  chargeback had appropriate support?

4      A    Yes.

5      Q    And was Circuit suppose to complete the

6  approval checklist before it finalized the chargeback

7  claim?

8           MR. FEINSTEIN:  Objection.

9           THE WITNESS:  Yeah, kind of like what I was

10          saying before, I don't really know when this was

11          implemented, that they were certain dollar

12          thresholds that had to be met, because this

13          document is not one that we would have sent out

14          externally, and we didn't necessarily save them

15          all, if that makes sense.

16  BY MR. GOLDWATER:

17      Q    When you say you didn't save them all, you

18  didn't -- do you mean you consciously saved some of

19  them but not others or it just so happens that you have

20  some but not others, and you have no idea why?

21      A    Yes, because all the chargeback documents

22  that you see were extracted from a system called

23  OnBase, which is just a document imaging system, if you

24  will, and chargebacks were scanned and put into that

25  system.  Whether or not they included the checklist

86

1    with it, it's hard to say, because that, again, isn't

2    something we would send to Sony.  So to support the

3    chargeback, it wouldn't need to be there to send to

4    Sony.

5         Q    Would it live inside of Circuit City's

6    records still?

7         A    If it were scanned into OnBase, yes.

8         Q    What happened if it wasn't scanned into

9    OnBase?

10        A    Then I have no idea if we have it or not.

11        Q    Who was doing the scanning?

12        A    It's just part of the overall chargeback

13   process.  After chargebacks were billed, the

14   corresponding documentation that justified the

15   chargeback, if you will, I don't know who physically

16   did the scanning, but there was a process in place

17   where chargebacks were scanned into OnBase so that you

18   could always go back and look at chargeback 97769, and

19   pull up the documents that were associated with it.

20        Q    Have you done that in the course of your

21   work?

22        A    Yes.  That's how we created or I created all

23   the documentation in the binders.  It was pulled from

24   OnBase.

25        Q    And what would have become of the documents

**87**

1    that weren't scanned into OnBase?

2          A    I don't know.  I mean, it could have been

3    sent to storage, could have been left behind.  Anything

4    that's relevant to support the chargeback should have

5    been scanned.  If it wasn't, then it may not have been.

6          Q    Was this chargeback approval checklist one of

7    the documents that was needed to support the

8    chargeback?

9                MR. CAINE:  Objection.

10               THE WITNESS:  Internally, at certain levels,

11        I believe it was, but not for external support.

12   BY MR. GOLDWATER:

13         Q    And maybe I'm exhausting your knowledge.  To

14   the best of your knowledge, when people were scanning

15   documents into OnBase, did they include chargeback

16   approval checklists when they were available to be

17   included?

18         A    I've seen it both ways, and again, part of it

19   is I don't know when they implemented the checklist,

20   and I don't know what level a checklist was required.

21         Q    When you say the level, you're saying for

22   certain dollar amounts of chargeback, you might need

23   this document, this approval checklist, and for lesser

24   amounts, you might not?

25         A    Correct.

88

1        Q    I see.  And do you know if for the

2   chargebacks that you do need it for, the approval

3   checklist was scanned in?

4        A    I can't say for certain.  It was an -- I

5   mean, we have thousands of chargeback documents in

6   OnBase.  I have no way of knowing that for sure.

7        Q    Understood.  And I don't expect you to sit

8   here and tell me about every chargeback.

9        A    Sure.

10       Q    I'm wondering if as a general process, you

11   know whether people were suppose to scan in approval

12   checklists, whether or not they actually did?

13       A    I don't even know if they were suppose to,

14   because again, it's not, it's not relevant to when we

15   bill the vendor.  It has no bearing on the vendor

16   support.  It's an internal control document.

17       Q    Okay.  If we look at the approval checklist

18   and you see the first caption says "secondary review"?

19       A    Yes.

20       Q    What was a secondary review?

21       A    Well, it looks like based on these dollar

22   amounts, someone other than the analyst that would be

23   at the top would have been required to review, based on

24   these dollar amounts.  But again, I wasn't involved in

25   creating this, nor did I ever check off anything on one

89

1  of these, so.

2       Q    And were the approval levels that you

3  mentioned those that are reflected in the box

4  underneath the secondary review caption?

5       A    It appears to be, yes.

6       Q    Do you see that there are different approval

7  levels for categories called "PPT", and a category

8  called, "all others"?

9       A    Yes.

10      Q    What was a PPT in this context?

11      A    I'm not sure.

12      Q    Do you know who would have that information?

13  Who would you ask?

14      A    I would probably ask Carole Elliott.

15      Q    Do you see that the chargeback 97769, that's

16  the subject of this approval checklist was in an amount

17  of over 7, about $7.4 million?

18      A    Yes.

19      Q    So for that kind of chargeback, and a

20  chargeback in that amount, I take it you would get a

21  secondary review by all of the four groups listed under

22  secondary review?

23           MR. CAINE:  Objection.

24           THE WITNESS:  I'm not sure, or if they would

25      jump directly to the highest level review.

**90**

1    BY MR. GOLDWATER:

2         Q    I see.  You don't know whether you need to

3    get all four or just the highest level?

4         A    Right.  Cause again, this is just internal

5    control.

6         Q    Were the secondary reviewers suppose to

7    indicate on the checklist whether they had approved the

8    chargeback?

9         A    It looks that way.  I've seen some where

10   they've initialed them.

11        Q    All right.  And have you seen any record of

12   whether they've approved, other than initialing them or

13   is that the way you've seen it?

14        A    That's the way I've seen it.

15        Q    And does this particular approval checklist

16   reflect whether the approvals have been obtained?

17        A    This one doesn't, no.

18        Q    And did Circuit do follow-up to try to get

19   approvals when it didn't get them originally?

20             MR. CAINE:  Objection.

21             THE WITNESS:  I'm not sure.  Generally

22        speaking, a chargeback wouldn't be finalized or

23        billed without the proper approvals.  It may be

24        that there's a completed checklist somewhere and

25        it's not in here.  I don't know.  At this date,

**91**

1        1/5/2009, it could have been an e-mail.  I have no

2        way to know, to be honest.

3   BY MR. GOLDWATER:

4        Q    And would this chargeback be submitted to

5   Sony without approval from the secondary reviewers or

6   review?

7             MR. FEINSTEIN:  Objection.

8             THE WITNESS:  I don't know if they would

9        approve it on this checklist, but it would go

10       through an accounting review process that was then

11       ultimately reviewed by our external auditors, as

12       well, on a quarterly basis.

13  BY MR. GOLDWATER:

14       Q    So you're saying at the quarter end, an

15  auditor could come back and look at chargebacks that

16  had gone out previously?

17       A    They definitely did.

18       Q    They're not involved in any preclearance of a

19  chargeback?

20       A    No.

21       Q    Do you see on the next section of the

22  chargeback approval checklist has a caption, "GL

23  Impact"?

24       A    Yes.

25       Q    What was GL Impact?

92

1      A     It would have been general ledger.

2      Q     And what information was suppose to be

3    recorded in the GL Impact section?

4      A     I can't say for sure, because this was not

5    filled out, but it looks like an allocation between

6    quarters, if appropriate.  In this case, this has a 7.4

7    million under MSP.  I'd have to look to see what this

8    chargeback was for.  Trailing credit, which if you go

9    back to 030123, has the type of must spend, subtype of

10   markdown.  I'm assuming the MSP is somehow related back

11   to that categorization.  Just, again, an internal

12   categorization.

13     Q     I'm sorry, to the best of your knowledge, MPS

14   refers to what?

15     A     Must spend markdown.

16     Q     What is a must spend markdown?

17     A     It's an internal categorization of vendor

18   funding.  This particular chargeback is sales-based,

19   and it ultimately would have triggered cost of sales

20   entry, which I really can't tell you why someone put

21   that dollar amount in that box.  I don't know who

22   filled it out.

23     Q     This also has that PPT next to it.  Do you

24   have any better recollection now than you did before?

25     A     I don't.  I mean, I just would be

93

1   speculating.

2        Q    Okay.  That's fine.  Do you see the third

3   section of the chargeback approval checklist says, "SAB

4   Impact"?

5        A    Yes.

6        Q    What did SAB impact refer to?

7        A    SAB was an accounting pronouncement that if

8   you were to make an error in reporting on the

9   financials of any particular magnitude, then that would

10  have an impact, and you would ultimately be responsible

11  for making any corrections.  Again, this is an area

12  that I think the external auditors would kind of hone

13  in on.

14       Q    Would you turn, please, to the next page, it

15  has number 30134?

16       A    Yes.

17       Q    Do you see that also has the heading

18  chargeback approval checklist?

19       A    Yes.

20       Q    And do you see underneath that it says, this

21  page must be included with all completed chargebacks?

22       A    Yes.

23       Q    What was the transmission of information that

24  that page was supposed to be included with?

25       A    I am not sure.

**94**

1      Q    Do you see that there is a caption under that

2   line that says, "documentation and support"?

3      A    Yes.

4      Q    Okay.  And under that, there is a bunch of

5   entries, lump sum, sales-based, price protection and

6   BOR?

7      A    Yes.

8      Q    Are those different types of chargeback

9   programs?

10     A    Yes.

11     Q    What's a BOR?

12     A    Based on receipt.

13     Q    And do you see under that, there is a line

14   that says, "standard procedure for all chargebacks"?

15     A    Yes.

16     Q    And is it your understanding that these refer

17   to all chargebacks as distinguished from the

18   chargebacks of a certain monetary threshold that you

19   referred to earlier, that required a secondary review?

20          MR. CAINE:  Objection.

21          THE WITNESS:  I don't know when this

22      checklist came about.  Like I said, I've seen some

23      that are filled out and some that aren't.  I know

24      that the analysts would have submitted this to the

25      supervisors.  Where it went from there, I'm not

1      sure.

2    BY MR. GOLDWATER:

3      Q    Yeah, I'm asking you a very narrow question

4    about whether this standard procedure for all

5    chargebacks literally means it applies to all

6    chargebacks, whereas I know you had told me that the

7    secondary review only applied to chargebacks of a

8    certain, over and above a certain monetary threshold.

9      A    That's what it says, but again, I don't know

10   what time frame that would cover.

11     Q    What time frame was the approval checklist in

12   effect?

13     A    I don't know.

14     Q    Was it in effect when you assumed responsible

15   in January of 2009?

16     A    I never was responsible for looking at one of

17   these.  So if it was, then it would have been at a

18   different level, perhaps at a supervisor level.

19     Q    I'm sorry, you do or don't know whether it

20   was in effect in January of 2009?

21     A    I don't, because it was never -- these were

22   never submitted to me.

23     Q    And do you have any understanding as to what

24   period of time these were in effect?

25     A    No.

96

1       Q     And who would you ask if you wanted to find
2   that out?

3       A     Either Carole Elliott or Greg Lambert.

4       Q     Okay.  Under the caption "standard procedure
5   for all chargebacks", do you see that there are
6   questions followed by boxes that give you the option
7   yes, no or N, slash A?

8       A     Yes.

9       Q     And are those questions that the analyst was
10   supposed to answer with respect to the questions?

11       A     That's my understanding.

12       Q     And do you see in this particular document,
13   there are a lot of blacked out boxes in the N/A column?

14       A     Yes.

15       Q     Is the blacked out box, to your
16   understanding, the response to those questions?

17       A     No.

18       Q     I see.  It's just the way it's printed?

19       A     I think you don't have the choice to select
20   N/A.

21       Q     I see.  I see.  So where it's a blacked out
22   box under N/A, you have to select either yes or no, is
23   that your understanding?

24       A     That's my understanding.

25       Q     Okay.  And for however long this approval

1    checklist was in effect, was it the procedure for the

2    analyst to respond to that list of questions?

3        A    I'm not sure.  I mean, I would assume so.

4        Q    Do you see the third question in this list of

5    questions, is, quote, does the effective date

6    correspond to period when funds are earned, question

7    mark, closed quote?

8        A    Yes.

9        Q    How did Circuit determine the period when

10   funds are earned?

11       A    It would be, in this instance, based on the

12   start and end date of the program.

13       Q    Did you say start and end date?

14       A    Uh-huh.  Yes.

15           MR. GOLDWATER:  I'm sorry.  Thank you.  Off

16       the record for a second.

17           (Brief discussion was held off the record.)

18           (Sony Exhibit No. 6 was marked.)

19   BY MR. GOLDWATER:

20       Q    I'm going to show you a document that's been

21   marked as Sony Exhibit Number 6.

22       A    Yes.

23       Q    Okay.  Ms. Fose, are you able to identify

24   this document?

25       A    Yes.

98

1      Q    What is it?

2      A    Advertising billing memo.

3      Q    And did Circuit City generate advertising

4  billing memos?

5      A    Yes.

6      Q    And what was an advertising billing memo?

7      A    I believe this was, again, just part of the

8  package that went out to the vendors when we billed for

9  chargebacks.

10     Q    So along with the other documents you already

11 showed me that went out to the vendor, they would

12 include a document like this?

13     A    Yes.  Yes, sir.

14     Q    Okay.  Do you see the bottom of the document

15 states that it was prepared by advertising accounting

16 and has a name, Dana Griffin?

17     A    Yes.

18     Q    What is advertising accounting?

19     A    It's all a part of vendor funding accounting.

20 It's just, over the years, Circuit City has many

21 different names for basically the same function.

22     Q    And did Ms. Griffin, for example, have any

23 responsibility for Circuit's submission of chargeback

24 97769?

25     A    Yes.  She's one of the billers I specifically

99

1   had to call and ask to come back to do the billing.

2        Q    So she's actually one of the analysts in

3   vendor funding who prepared the claim for submission to

4   Sony?

5        A    She wasn't an analyst.  She would have been

6   one of the folks I was referring to as a biller, which

7   was lower level than an analyst, but I don't remember

8   the exact title.

9        Q    I see.  So there were the people you already

10  identified as Ms. Elliott, and the people that reported

11  to her, and there were analysts and then there were

12  billers?

13       A    Yes.

14       Q    Were there any other categories?

15       A    Probably, I don't remember everyone's titles,

16  to be honest.

17            MR. GOLDWATER:  Off the record for a minute.

18            (Brief discussion was held off the record.)

19            MR. GOLDWATER:  May I have this marked as 7,

20       please.

21            (Sony Exhibit No. 7 was marked.)

22  BY MR. GOLDWATER:

23       Q    I show you what -- do you have the Exhibit 7

24  in front of you?

25       A    Yes.

100

1       Q      Okay.  Is the Exhibit 7 documents that

2   concern Circuit City chargeback 92982?

3       A      Yes.

4       Q      And do you see that the document with number

5   50063 is a chargeback cover sheet for chargeback 92982?

6       A      Yes.

7       Q      And you see that cover sheet is dated

8   November 12, 2008?

9       A      Yes.

10      Q      And if you look at the next page, 500 --

11  excuse me, if you look two pages into a document that

12  says, an SEL Bate's number 439, do you see that that is

13  a, is that a confirming letter?

14      A      Yes.

15      Q      And is that a confirming letter from Circuit

16  to Sony regarding chargeback 92982?

17              MR. FEINSTEIN:  Objection.

18              THE WITNESS:  Yes.

19  BY MR. GOLDWATER:

20      Q      And did Circuit send this claim to Sony on

21  November 12, 2008?

22      A      It appears that they did.

23      Q      Okay.

24              MR. CAINE:  Can I stop you for a second?

25              MR. GOLDWATER:  Sure.

101

1          MR. CAINE:  This document, the last page, is

2      that something you just stapled to the others in

3      order to create Exhibit 7?

4          MR. GOLDWATER:  Yes.  Absolutely correct.

5  BY MR. GOLDWATER:

6      Q    Okay.  Now I think you touched on this

7  before, but I want to ask you just with the benefit of

8  this Exhibit 7 in front of you.  Was there a time when

9  Circuit's standard format for confirming letters stated

10 take Circuit would collect payments for chargebacks via

11 a deduction from the vendor's AP balance?

12     A    Yes.

13     Q    And do you know when that period ended or

14 when there was a change?

15     A    I know that there was a change after filing,

16 because the entire paragraph was changed.  What I

17 didn't know is if in every single instance of a

18 chargeback prior to that, that it read this exact way.

19 I'm not 100 percent sure.

20     Q    Okay.  All right.  And if you look at Exhibit

21 2, which is Exhibit B to the complaint.

22     A    Yes.

23     Q    And I know you were anticipating where I was

24 headed with this.  Do you see on page five, the fourth

25 line down, has a reference or an entry for that

102

1  chargeback 92982?

2      A    Yes.

3      Q    And do you see in the pre-post column that

4  this particular chargeback is classified as a

5  pre-petition chargeback?

6      A    Yes.

7      Q    And why is it that it is described as a

8  pre-petition chargeback?

9      A    Because the program itself was for July,

10 August and September.  So the end of that program would

11 have been September 30th, which is prior to the

12 bankruptcy filing.

13     Q    And was Circuit entitled to that chargeback

14 before it submitted a claim to Sony?

15         MR. CAINE:  Objection.

16         THE WITNESS:  I believe we were entitled as

17     soon as we performed the obligations under the

18     program, which appears to be September 30th.

19 BY MR. GOLDWATER:

20     Q    Okay.  And what's the basis for your belief?

21     A    That's the end date of the program, itself.

22 We would have earned the financing funding through that

23 date.

24     Q    Are you informed by accounting guidance when

25 you come to that?  Is that part of the basis of your

103

1  belief?

2           MR. FEINSTEIN:  Objection.

3           THE WITNESS:  There is accounting guidance

4       surrounding consideration received from vendors.

5       There's a lot of accounting guidance that speaks

6       to the timing of when you record entries, but yes,

7       Circuit City's belief is that we earned the

8       funding based on the effective dates of the

9       funding, and that's when it would be recorded and

10      earned.

11          MR. GOLDWATER:  Okay.  Should we break?

12          (Recess was taken for lunch.)

13  BY MR. GOLDWATER:

14      Q    Ms. Fose, would you please look at Sony

15  Exhibit 2, which is Exhibit B to the amended complaint

16  in front of you?

17      A    Sure.

18      Q    And if you would, please, take a look at page

19  13 of 76.

20      A    Yes.

21      Q    Just to orient you, do you see the page

22  before that says billback?

23      A    Yes.

24      Q    Okay.  Do you see the field, I'm sorry, the

25  column title at the top of page 13 of Exhibit 2, that

1  says "date"?

2        A    I'm sorry, say that again.

3        Q    Sure.  Do you see the column titles that run

4  across the top of the page of Exhibit 13 -- I'm sorry,

5  page 13 of Exhibit 2?

6        A    Yes.

7        Q    Okay.  And I'm going to direct your attention

8  to the column titled "date".  It's about halfway.

9        A    Yes.

10        Q    Okay.  What does the date column show?

11        A    That is the key rec date.

12        Q    What is a key rec?

13        A    Key rec is an internal Circuit City number

14  for receivings.

15        Q    Am I understanding you that this shows the

16  date on which Circuit City received product?

17        A    Yes.

18        Q    And how does Circuit City's receipt of

19  product bare on its entitlement to a billback?

20        A    These billbacks are based on receipt.  So the

21  receipt date would obviously have an impact.

22        Q    I see.  The program, the billback programs

23  offer a chargeback upon Circuit City's purchase and

24  receipt of certain product?

25        A    Yes.

105

1       Q    I see.  Okay.  So did Circuit become entitled

2  to the billback upon its receipt of the product that

3  was the subject of the program?

4       A    That's my understanding, yes.

5       Q    And is the process for submitting a billback

6  claim to Sony the same as for a chargeback?

7       A    Yes, that's my understanding.

8       Q    Okay.  Do you see that the columns across the

9  top of page 13 of Exhibit 2, also have a column called

10  RPT, period, DP, period?

11      A    Yes.

12      Q    And what is -- does that stand for anything?

13      A    It's report date.

14      Q    And what is the report date in this context?

15      A    This is the date of the report of these

16  receivings, which generally occurred a few days after

17  the accounting month-end.  I don't recall a specific

18  name of the report, but --

19      Q    So that date will lag the actual receipt of

20  the product by some number of days?

21      A    Yes.  If you receive the product any time in

22  this, say the first line, for example, the month of

23  December, then the report on those receivings would

24  take place just a few days after the calendar

25  month-end.

106

1      Q      And when in relation to Circuit's receipt of

2    the product did it submit the billback claim to Sony?

3      A      I would have received the information

4    regarding the receivings after this report date, and

5    then the billing would have taken place after that.  I

6    don't know the specific number of days.

7      Q      Is it a matter of days from that point?

8      A      Should be.

9      Q      Does Circuit have record that would show when

10   it submitted billback claims to Sony?

11     A      The majority of claims are submitted via

12   e-mail, so we may have them.  We produced all the

13   e-mails we had access to.  I don't recall specifically

14   seeing the e-mail related to these billbacks.

15     Q      Okay.  They were submitted via e-mail.  Were

16   they submitted with the cover sheet and the other forms

17   that we saw with respect to billbacks?

18     A      In theory, but I don't recall seeing those

19   specifically for these.  It's, I believe the support

20   for these billbacks are in the binders.  It's

21   referenced earlier on in this exhibit.  Yes, it looks

22   like on page seven, it says binder six.

23     Q      What does that support look like, is that

24   e-mails?

25     A      I'd have to see it in front of me.

1      Q    As we sit here, you don't remember what that

2  looks like?

3      A    Most of the support, in general, included

4  e-mails, so it probably did.  But I don't remember

5  exactly what the support was for these billbacks.

6      Q    Okay.  And other than the e-mails, did

7  Circuit maintain any records as to when it submitted

8  the billback claim to Sony?

9      A    Whatever we have, we produced.  I just don't

10  remember the specifics of what we produced.

11      Q    When did Sony record in its records its

12  entitlement to the billback?

13          MR. FEINSTEIN:  Objection.  When did Sony?

14  BY MR. GOLDWATER:

15      Q    I'm sorry.  My mistake.  When did Circuit

16  City record in its books its entitlement to the

17  billback?

18      A    It would have been based on this report date.

19  That's when it would have been recorded from an

20  accounting standpoint.

21      Q    I see.  So at that point, Circuit is showing

22  a receivable from Sony in the amount of the billback?

23      A    Right.  And for some reason, it crossed over

24  quarters, since we were a publicly traded company, so

25  quarterly reporting was critical, then someone would

108

1    run a query to see what the receivings were and at

2    least account for some type of vestment for it, but

3    getting it into the system wouldn't occur until after

4    this report date.

5              MR. GOLDWATER:  May I have this marked as

6         Sony Exhibit 8.

7              (Sony Exhibit No. 8 was marked.)

8    BY MR. GOLDWATER:

9         Q    Okay.  I show you what's been marked as Sony

10   Exhibit 8, and ask you to please take a look at that.

11        A    Okay.

12        Q    Okay.  Do you see that Sony Exhibit 8 has a

13   first page that refers to a billback in the amount of

14   572,740 dollars?

15        A    Yes.

16        Q    Do you see the second page appears to be an

17   e-mail from Bob Altermatt to Charles Farmer at Circuit

18   City?

19        A    Yes.

20        Q    Have you ever seen this e-mail before?

21        A    I don't recognize this one specifically.

22        Q    Okay.  In March of 2009, were you involved in

23   reconciling billback claims that Circuit had submitted

24   to Sony?

25        A    I wouldn't have been reconciling the claims.

109

1   That would have really occurred with the buyer and

2   Sony, and if, as a result of that, there were any

3   things that needed to be corrected, they would have

4   communicated that to accounting.  My first

5   reconciliation, for lack of a better term, didn't occur

6   until our counsel contacted Mr. Barrett.

7        Q    Okay.  Were the buyers still there at Circuit

8   in March of 2009?

9        A    Some buyers were.  Charles Farmer was.

10       Q    I see.  So the first instance, it would have

11  been Mr. Farmer's responsibility to deal with an e-mail

12  like this?

13       A    Yes.

14       Q    Okay.  If you look at the text of the e-mail,

15  do you see that Mr. Altermatt is writing to Mr. Farmer,

16  and asking him to revise claim amounts?

17       A    Yes.

18       Q    Did Circuit or the Trust ever respond to Mr.

19  Altermatt's e-mail, to the best of your knowledge?

20       A    To the best of my knowledge, someone would

21  have replied, and I'm not familiar with this e-mail,

22  but I know in the binders, we have e-mails where there

23  was communication back to Mr. Altermatt about

24  billbacks.  I don't know if it was this specific one or

25  not.

110

1      Q    Okay.  So I take it Circuit or the Trust, for

2  that matter, would not have any reason not to respond?

3      A    Correct.

4      Q    They would try to respond, if they could?

5      A    Correct.

6      Q    And would anyone besides Mr. Farmer be

7  involved in trying to ascertain whether what

8  Mr. Altermatt was saying to him was correct or not?

9      A    Well, Elliot Becker is copied on the e-mail,

10  and he was, to the best of my recollection, still at

11  Circuit City at that time.

12      Q    And what was Mr. Becker's position?

13      A    I don't remember his exact title.  The

14  merchandising department kind of had unusual titles.  I

15  want to say it was BTL, business team lead or something

16  like that.  He was fairly high up within the

17  merchandising organization.

18      Q    Okay.  Was there anybody in vendor funding,

19  if I have the name of the group correct, who was

20  assigned to deal with MDF claims?

21      A    I don't know that there was anyone specific,

22  but Greg Lambert, if there was anything that needed to

23  be adjusted on our end, would have taken care of it or

24  would have overseen the process, assuming he received

25  communication from Charles or Elliot.

111

1        Q     And if there was a response, I would find it

2     in the Trust production of documents to us?

3        A     You should.  If it supports the actual amount

4     that's in the spreadsheet you would, yes.

5        Q     Okay.

6        A     Or if it were just under general e-mails.

7     It's hard for me to say exactly what e-mails are in

8     there, but we produced all that we had access to.

9        Q     And would you have any way of ascertaining

10    today whether what Mr. Altermatt was conveying to

11    Mr. Farmer about the MDF claims was accurate?

12       A     Are you asking me if his corrections are

13    correct?

14       Q     Yeah, I'm asking if you, today, if you set

15    out to do it, and I'm not suggesting that you have, but

16    if you set out to do it, would you have a way of

17    figuring out whether what he says is correct?

18       A     Possibly.  I don't -- I'm not sure.  I would

19    have to look at our support, obviously, and the detail

20    transactions that we have available.  It's possible.

21       Q     And how would you go about finding the

22    documents that he relates to this particular MDF claim?

23       A     Honestly, I would start in binder six, with

24    what we had as the chargeback support.  There may be

25    notes in there.  There may be a responsive e-mail to

112

1   this, which may bring closer to the topic all together.

2        Q    And then the absence of any other further

3   response, is there anything else you would be able to

4   do?

5        A    Well --

6             MR. CAINE:  Objection.

7             THE WITNESS:  If I understand the e-mail

8        correctly, it sounds like he thinks we've already

9        claimed certain amounts, so that I could certainly

10       validate through the receivable system.

11            MR. GOLDWATER:  Okay.  I have some questions

12       about areas in which I think you deferred to

13       Ms. Ferguson, so I thank you very much.

14            THE WITNESS:  You're welcome.

15

16

17

18

19

20

21

22

23

24

25

113

1   COMMONWEALTH OF VIRGINIA,

2   CITY OF CHESAPEAKE, to wit:

3

4        I, Lisa T. Lineberry, a Notary Public in and

5   for the Commonwealth of Virginia at Large, whose

6   commission expires April 30, 2016, certify that the

7   foregoing testimony was duly taken and sworn to

8   before me at the time and place and for the purpose

9   in the caption mentioned, and that the foregoing is

10  a true and correct transcript to the best of my

11  ability of the testimony and other proceedings

12  herein.

13       I further certify that I am not a relative or

14  employee of attorney or counsel of any of the

15  parties or financially interested in the action.

16       Given under my hand this    day of July, 2014.

17

18                          _____
                            Notary Public
19                          Registration No. 244567

20

21

22

23

24

25